<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    FORT WORTH DIVISION

 3
    UNITED STATES OF AMERICA,      )  Case No. 4:18-MJ-00268-BJ
 4                                 )
           Plaintiff,              )
 5                                 )  Fort Worth, Texas
    v.                             )  April 30, 2018
 6                                 )  11:00 a.m.
    MOHAMED TOURE (01) AND         )
 7  DENISE CROS-TOURE (02),        )  PRELIMINARY HEARING
                                   )  DETENTION HEARING
 8           Defendants.           )
    _____)
 9
                     TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE JEFFREY L. CURETON,
                UNITED STATES MAGISTRATE JUDGE.
11
    APPEARANCES:
12
    For the Government:        Rebekah Bailey
13                             William Edward Nolan
                               U.S. DEPARTMENT OF JUSTICE
14                             950 Pennsylvania Avenue N.W.
                               Washington, D.C.  20530-0001
15                             (202) 598-6408

16  For Mohamed Toure:         Brady T. Wyatt, III
                               LAW OFFICE OF BRADY WYATT
17                             3300 Oak Lawn, Suite 600
                               Dallas, TX  75219
18                             (214) 559-9115

19  For Denise Cros-Toure:     Scott H. Palmer
                               Rebekah Perlstein
20                             SCOTT H. PALMER, P.C.
                               15455 Dallas Parkway,
21                                Suite 540, LB 32
                               Addison, TX  75001
22                             (214) 987-4100

23  For Probation and Pretrial  Robert Honstein
    Services:
24

25
</pre>

```
 1   Recorded by:              Julie Harwell
                               UNITED STATES DISTRICT COURT
 2                             510 W. 10th Street
                               Fort Worth, TX  76102
 3                             (817) 850-6697

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by digital sound recording;
             transcript produced by transcription service.
```

```
 1            FORT WORTH, TEXAS - APRIL 30, 2018 - 10:56 A.M.

 2            THE COURT:  Thank you.  Please be seated.  The Court

 3   calls for preliminary and detention hearing Cause No. 4:18-MJ-

 4   268.  It is United States versus Mohamed -- how do you

 5   pronounce your client's last name?

 6            MR. WYATT:  Toure.

 7            THE COURT:  Toure.  Thank you.  And also United States

 8   versus Denise Cros-Toure.

 9            MR. PALMER:  Correct, Your Honor.

10            THE COURT:  Very good.  For the Government is Mr.

11   William Nolan --

12            MR. NOLAN:  Yes, Your Honor.

13            THE COURT:  -- and Ms. Rebekah Bailey.

14            MS. BAILEY:  Yes, Your Honor.

15            THE COURT:  Is the Government ready to proceed?

16            MS. BAILEY:  Yes, Your Honor.

17            THE COURT:  And for the Defense, for Mr. Toure, Mr.

18   Brady Wyatt.

19            MR. WYATT:  Good morning.

20            THE COURT:  Ready to proceed, sir?

21            MR. WYATT:  Yes, Your Honor.

22            THE COURT:  And Mr. Scott Palmer for Ms. Cros-Toure.

23            MR. PALMER:  We are ready to proceed, Your Honor.

24            THE COURT:  Very good.  The --

25            MR. PALMER:  And if I may, --
```

1          THE COURT:  Yes.

2          MR. PALMER:  -- I have my associates that may be

3    engaged in part of the hearing, Rebekah Perlstein and James

4    Roberts.

5          MS. PERLSTEIN:  Good morning.

6          THE COURT:  All right.

7          MR. ROBERTS:  Good morning.

8          THE COURT:  Thank you both.  You may be seated.  All

9    right.  So, it's a packed courtroom.  There's not enough seats

10   for everyone.  If you will, keep your movements to a minimum

11   out there.  I know you may want to step out, with the lack of

12   seating, but let's please try to keep it in order in the back.

13      All right.  The Government may proceed.  You may call your

14   first witness.

15         MS. BAILEY:  Thank you.  The Government will call

16   Special Agent Katherine Langston.

17         THE COURT:  Agent, if you would please come forward.

18   I'm going to ask you to raise your right hand and be sworn by

19   my clerk.

20      (The witness is sworn.)

21         THE COURT:  Thank you.  Thank you.  You may have a

22   seat.  We record, so I'm going to ask everyone in the courtroom

23   to please use the microphones on your table, and the witness

24   also has a microphone.  And counsel, you may proceed.

25         MS. BAILEY:  Thank you, Your Honor.

1          KATHERINE LANGSTON, GOVERNMENT'S WITNESS, SWORN

2                        DIRECT EXAMINATION

3   BY MS. BAILEY:

4   Q    Special Agent Langston, would you please introduce yourself

5   to the judge and the court reporter and spell your last name?

6   A    I am Special Agent Katherine Langston, L-A-N-G-S-T-O-N.

7   I'm a special agent with United States Department of State,

8   Diplomatic Security Service.

9   Q    Where were you before the Diplomatic Security Service,

10  Agent?

11  A    I started with the Diplomatic Security Service in 2011, and

12  before that I was a special agent with the United States Secret

13  Service beginning in 2002.

14  Q    What do you specialize in investigating at your current

15  agency?

16  A    I'm one of the special agents that's assigned to the Human

17  Trafficking Task Force in Houston.  I specialize in

18  international human trafficking, where either the trafficker or

19  the victim is a foreign national.

20          MS. BAILEY:  Your Honor, if I may approach, I have

21  Exhibit 1.

22          THE COURT:  You may.

23  BY MS. BAILEY:

24  Q    Agent Langston, do you recognize what I just provided to

25  you?

1   A    Yes.

2   Q    And what is that?

3   A    This is Mrs. Jane Doe's United States visa that's adhered

4   to her Guinea passport.

5   Q    What kind of visa is it?

6   A    It is a B-2 non-immigrant visa.

7   Q    How long was that visa valid?

8   A    Three months.

9   Q    What date did she enter the United States?

10  A    She arrived in Houston on January 19, 2000, and then she

11  took a connecting flight over to Dallas.

12  Q    So she flew from where?

13  A    She flew from Conakry, Guinea, to Houston by herself.

14  Q    What is the date of birth of Jane Doe on that passport?

15  A    March 31, 1994.

16  Q    And you said she entered in 2000?

17  A    Uh-huh.

18  Q    So she would have been approximately --

19  A    Six years old.

20  Q    -- six years old at the time of entry, according to that

21  date of birth?

22  A    Yeah.

23  Q    Have you had an opportunity to interview Ms. Doe as part of

24  your investigation?

25  A    Yes.  Multiple times.

1  Q   Have you also interviewed other witnesses and gathered

2  quite a bit of documentary evidence --

3  A   Yes.

4  Q   -- as part of your investigation?  Unless you state

5  otherwise, the answers to my questions today are going to be

6  based on those interviews as well as the evidence that you've

7  obtained, correct?

8  A   Yes.

9  Q   Who picked up Ms. Doe from the airport?

10 A   Mr. Toure and some of the Toure children.

11 Q   I'm going to bring to you Government's Exhibits 2 and 3

12 after I give them to Defense.  Agent Langston, who is depicted

13 in Photo 2?

14 A   That's Mr. Mohamed Toure.

15 Q   And do you see him here in the courtroom today?

16 A   Yes, I do.

17 Q   And who is Exhibit 3 a photo of?

18 A   That's Ms. Denise Cros-Toure.

19 Q   Is she in the courtroom today?

20 A   Yes, she is.

21 Q   After her arrival, did Ms. Doe keep her visa inside of her

22 Guinea passport?

23 A   No.  She relinquished those over to Mr. Toure and Ms. Cros-

24 Toure.

25 Q   During the course of your investigation, have you

1    determined generally what Ms. Doe's role was in the Defendants'

2    home?

3    A    When she initially got here, her responsibilities were

4    caring for the youngest child, which was two years old at the

5    time, and then assisting with cooking and cleaning.

6    Q    And how long did that go on?

7    A    For sixteen years.

8    Q    How -- was Ms. Doe ever paid?

9    A    No.

10   Q    How old were the Defendants' children when Ms. Doe came to

11   the U.S.?

12   A    At that time, they were approximately 9, 8, 5, and 2.  The

13   youngest hadn't been born yet.

14   Q    Which country are the Defendants from originally?

15   A    Guinea.

16   Q    And where is the victim from?

17   A    Guinea.

18   Q    Where did Ms. Doe work prior to coming to the United

19   States?

20   A    At the family with Ms. Cros-Toure, with her parents.

21   Q    And where was that?

22   A    In Guinea.  In Conakry, Guinea.

23   Q    Did the Defendants grow up in a rural part of Guinea or in

24   a more modern city?

25   A    They grew up in the capital, in Conakry.

1   Q    What have you come to find out about the status of their

2   fathers back in Guinea?

3   A    So, Mr. Toure's father was actually the first president of

4   Guinea.   And then Ms. Cros-Toure's father was a minister in his

5   administration.

6   Q    And going back, Agent, I apologize, if you could identify

7   where each of the Defendants is seated and what they're

8   wearing.

9   A    I'm sorry.   Mr. Mohamed Toure is sitting in the front next

10  to his attorney, wearing an orange and tan jumpsuit.   And Ms.

11  Cros-Toure is on the second table seated in the middle wearing

12  the same orange and tan jumpsuit.

13            MS. BAILEY:   Your Honor, will you let the record

14  reflect that the agent has identified the Defendants?

15            THE COURT:   The record shall so reflect.

16  BY MS. BAILEY:

17  Q    Were the Defendants well off when they grew up in Guinea?

18  A    We believe so.

19  Q    And you had a chance to interview Mr. Toure after his

20  arrest, correct?

21  A    Yes.

22  Q    Did he tell -- what did he tell you about whether or not

23  they had servants?

24  A    Yes.   He said that they -- both himself and Ms. Cros-Toure

25  grew up with servants in their households in Guinea.

1   Q    Based upon your investigation, what have you determined is

2   the relationship between Jane Doe and the Defendants?

3   A    That Jane Doe's father's uncle is Ms. Cros-Toure's father.

4   Q    So, some sort of distant family relation, safe to say?

5   Okay.  Where was Ms. Doe born?

6   A    In a small eastern village in Guinea.

7   Q    What did her family do for work?

8   A    It's a very small village.  The State Department estimates

9   the population at only 25,000.  Her father was a farmer and her

10  mother sold produce.

11  Q    Before going to work for Ms. Cros-Toure's parents in

12  Conakry, what was Ms. Doe's education level?

13  A    She attended a few years of school.

14  Q    What is the indigenous language that she spoke?

15  A    Malinke.

16  Q    Was she fluent in French?

17  A    No.

18  Q    Based upon your investigation, what have you determined was

19  the arrangement between the Defendants and Ms. Doe's parents

20  regarding Ms. Doe coming to the United States?

21  A    Through our State Department agent's interview, the father,

22  who advised that Ms. Cros-Toure's father had said that this

23  would be an opportunity for his daughter to go to the United

24  States, get acclimated with Ms. Cros-Toure, get educated, and

25  be afforded better opportunities than she would have in Guinea.

1  Q    Just for clarity's sake, your agents in-country have

2  interviewed Jane Doe's father?

3  A    Yes, ma'am.

4  Q    Okay.  And he had a conversation with defendant Cros-

5  Toure's father?

6  A    Yes.

7  Q    What is Ms. Doe's immigration status currently?

8  A    She is continued presence.

9  Q    And what was her status before that?

10 A    Visa overstay.

11 Q    What is Mr. Toure's immigration status?

12 A    He and Ms. Cros-Toure are both legal permanent residents.

13 It's equivalent -- it's like a green card.

14 Q    How did they get that status?

15 A    Mr. Toure applied for asylum based on -- as a political

16 refugee, and then Ms. Cros-Toure got asylum as a derivative.

17 Q    Do you recall the year that the asylum was granted?

18 A    I don't have my reports in front of me, but it was like in

19 the early 2000s.

20 Q    Okay.  So they have been LPRs for a while?

21 A    Yes.

22 Q    I'm going to bring to you what I've previously marked as

23 Government's Exhibits 4 and 5, after I pass them out.

24         MR. WYATT:  Thank you.

25 BY MS. BAILEY:

1   Q    Agent Langston, do you recognize Exhibit 4 and Exhibit 5?

2   A    Yes.

3   Q    And, generally, what are those documents?

4   A    This is a travel analysis that our analyst compiled related

5   to Mr. Toure and Ms. Cros-Toure.

6   Q    Is this analysis exhaustive or complete at this point?

7   A    No.

8   Q    So this is based on the best information we have now?

9   A    Yes.

10  Q    How many travel documents does Mr. Toure have?

11  A    To enter into the United States, he has three valid travel

12  documents.

13  Q    And where are those travel documents from, the issuing

14  country?

15  A    Sorry.  Two are from Guinea, and then his -- he would be

16  permitted to enter the United States with his legal permanent

17  resident card.

18  Q    And the dates that are on these documents show the travel

19  just in the incident time period for this case, correct?

20  A    Yes.

21  Q    So that's 2000 to 2016?

22  A    Yes.

23  Q    Or, excuse me, to present?  When is the last time that Mr.

24  Toure was in Africa?

25  A    The last time he had left for Guinea was in October 2016.

1   Q    When did he come back from that visit?

2   A    Two weeks ago.

3   Q    So April of this year?

4   A    Yes.  Sorry.  April 8th of 2018.

5   Q    Uh-huh.  And then turning to Ms. Cros-Toure's travel, how

6   many documents, valid travel documents does she have?

7   A    She also has three documents that would allow her admission

8   to the United States.

9   Q    Where is her other travel document from?

10  A    She has a French passport, a Guinea passport, and then her

11  legal permanent resident card.

12  Q    When is the last time she was in Africa?

13  A    She had left in December 2017 and she arrived on the same

14  flight with Mr. Toure.

15  Q    So there was a period of time early this year where neither

16  of them was here in the United States?

17  A    Correct.

18  Q    During the course of your investigation, have you found

19  U.S. employment records for either of the defendants?

20  A    For Mr. Toure, no.  For Ms. Cros-Toure, she worked for an

21  airline briefly, and then there's intermittent kind of

22  employment with the Carroll Independent School District.

23  Q    Have agents within your department been able to determine

24  what it is that Mr. Toure does while he's in Guinea?

25  A    Yes.  He is the Secretary General for the PGR.  It's like

1  the political opposition party in Guinea.

2  Q    Does the United States have a Mutual Legal Assistance

3  Treaty regarding extradition with the Republic of Guinea?

4  A    No.

5  Q    How old are the Defendants' children now?

6  A    Approximately 27, 26, 23, 20, and 15.

7  Q    Agent, I'm going to ask you a few questions about Ms. Doe's

8  work in the Defendants' home now, okay?

9  A    Sure.

10  Q    So you described earlier that she did some child care

11  initially; is that correct?

12  A    Yes.

13  Q    And how did the tasks evolve after the children were older?

14  A    The tasks evolved.  As she grew older, she was basically

15  tasked with more things.  So, initially, it was caring for the

16  youngest son.  Feeding him, caring for him, entertaining him.

17  Then they had another, their youngest daughter.  Same thing

18  with that, kind of the nanny and cleaning the house.  And then

19  it progressed into mowing the yard, walking the dog.

20  Q    Doing --

21  A    Cleaning out.  That kind of stuff.

22  Q    -- household chores?  Okay.

23  A    Yeah.

24  Q    What was her typical daily schedule?

25  A    Roughly wake up between 6:30 and 7:00.  Help cook, get

 1   everything ready for the other Toure children to go to school.

 2   And then ended her day around 10:00 o'clock.  And that

 3   proceeded all week.  Didn't have a day off.

 4   Q    No days off?

 5   A    No days off.

 6   Q    After she cooked the meals, did Ms. Doe eat with the

 7   Defendants and their family?

 8   A    The only time she ate with them is if they were out at a

 9   restaurant or if it was a holiday.  Otherwise, the way she

10   describes it was she would set the table for the children, feed

11   them, clean, set the table for the adults, feed them, and then

12   she would either eat before or after.

13   Q    When you asked Ms. Doe whether or not she ever sat a place

14   for herself at the table regularly, what did she say?

15   A    Oh, God, no.

16   Q    Does Ms. Doe speak -- did she speak English prior to coming

17   to the United States?

18   A    No.

19   Q    Does she speak English now?

20   A    Yes.

21   Q    Now I'm going to ask you a few questions about Jane Doe's

22   living conditions in the United States, okay?

23   A    Sure.

24   Q    Where did Ms. Doe sleep in the Defendants' home?

25   A    Initially, she slept on the floor of Sarah's -- I apologize

```
 1   -- one of the oldest daughters' bedrooms.  And then after one

 2   of the children went to school, there was a bedroom shuffle, it

 3   sounds like.  Then she slept on the -- in a twin bed in the

 4   youngest daughter's bedroom.

 5   Q    And have you been --

 6            THE WITNESS:  I'm so sorry, Your Honor.  I did not

 7   mean that.

 8            THE COURT:  I understand.

 9            THE WITNESS:  Sorry.

10   BY MS. BAILEY:

11   Q    Have you been able to confirm that sleeping arrangement

12   with one of the Defendants' children?

13   A    The oldest son relayed the same information to our agents.

14   Q    Where did Ms. Doe say that she got her clothes while she

15   was at the Defendants' home?

16   A    Typically, hand-me-downs.  And when she was younger, it was

17   like from the boys, the sons.

18   Q    Where did Ms. Doe bathe in the house?

19   A    She shared a bathroom with some of the Toure children.

20   Q    Was she allowed to use the products that the other children

21   used?

22   A    No.

23   Q    Did Ms. Cros-Toure help the daughters with their hair?

24   A    Yes.

25   Q    Did Ms. Cros-Toure help Jane Doe with her hair?
```

1   A    Not regularly.

2   Q    Did Cros-Toure ever say she disliked Ms. Doe's hair?

3   A    Yes.

4   Q    And what happened after she told her that she did not like

5   her hair?

6   A    There was an incident where she put relaxer on her hair and

7   -- but didn't teach her how to read the -- like how to continue

8   treatment or frequency or anything like that, so then her hair

9   became unwieldy again, and then she related a story about how

10  Mr. Toure then shaved her head.

11  Q    When you interviewed Mr. Toure, did he verify to you that

12  he used clippers on Joe Doe's hair?

13  A    Yes.

14  Q    Did he ever use clippers on his daughters' hair?

15  A    No.

16  Q    Was Ms. Doe enrolled in school?

17  A    Never.

18  Q    During your investigation, have you had the opportunity to

19  subpoena records from Carroll ISD?

20  A    Yes.

21  Q    Did you obtain records for all of the Defendants' children?

22  A    Yes.

23  Q    Did you obtain records for Ms. Doe?

24  A    No records could be found.

25  Q    When you went to the Defendants' home, Ms. Cros-Toure

1   consented to allow you to search her home, correct?

2   A    Yes.

3   Q    As part of that, she directed you to some specific family

4   photo albums, right?

5   A    Yes.  When we asked where there would be evidence related

6   to Jane Doe, she directed our agents to the front office where

7   all the family photos and their documents are.

8   Q    And you had a chance to look through those photo albums,

9   correct?

10  A    Yes.  We -- prior to seizing some of the albums, she

11  actually went with -- through with the agents which ones we

12  should take that would have -- that kind of depicted the

13  children growing up and said that there would be photos of Jane

14  Doe and evidence of her in those.

15  Q    Okay.  Did the Defendants' children celebrate birthdays

16  with cake and parties and that sort of thing?

17  A    Yes.  Yeah.  Absolutely.

18  Q    Okay.  I am going to show you Government's Exhibits 6, 7,

19  and 8 after I pass them out.  Agent Langston, do you recognize

20  those photos?

21  A    I do, yes.

22  Q    Where did you get Photo 6?

23  A    Photo 6 was actually provided by Jane Doe.

24  Q    And Photos 7 and 8, did those come from the albums that Ms.

25  Cros-Toure directed you to?

1  A    Yes.

2  Q    Okay.  What is generally depicted in all of the photos, or

3  what event is being celebrated in all the photos?

4  A    A birthday party for one of the Toure children.

5  Q    And in Photo 6, which adults are at the table?

6  A    That is Ms. Cros-Toure's sister and mother.  And then, oh,

7  sorry, seated at the table are the four oldest Toure children.

8  Q    Where is Jane Doe?

9  A    Standing behind Ms. Cros-Toure's sister.

10 Q    And in Exhibit 7, what do we see depicted there?

11 A    It's another birthday party at the house.  Ms. Cros-Toure

12 is in the photo.  Mr. Toure is in the photo.  Jane Doe is

13 actually not in the photo.

14 Q    And that's also the birthday party with the cake, correct?

15 A    Yes.

16 Q    And then looking at Exhibit 8, what do we see there?

17 A    It's another -- it's a birthday party where you can see

18 some of the Toure children seated.  You can see Ms. Cros-Toure

19 standing over the table.  And then you can actually see Jane

20 Doe standing behind her with her hands folded.

21 Q    What did Jane Doe tell you about celebrating her birthday?

22 A    So, during interviews when we were trying to establish some

23 timelines and figure out what age she was, that's when it was

24 revealed that she actually never celebrated a birthday.  So she

25 actually has no idea how old she is.

1  Q    So, in general, she does not know her age?

2  A    No, she currently does not.

3  Q    Did you find any photos in those albums of Jane Doe having

4  a birthday celebration?

5  A    No.

6  Q    What did Mr. Toure tell you about celebrating Jane Doe's

7  birthday?

8  A    He admitted that they did not celebrate her birthday

9  because they did not know her birthday.

10  Q    Did the Defendants have a landline phone in their home?

11  A    Yes.

12  Q    Was Jane Doe allowed to use that phone to call her family

13  in Guinea?

14  A    To call her family?  No.

15  Q    When was she able to call her family?

16  A    Typically, when Ms. Cros-Toure's mother would come visit,

17  she would then call Jane Doe's family back in Guinea.

18  Q    About how many times was Jane Doe able to speak to her

19  family in Guinea?

20  A    Over 16 years, less than ten.  Less than a dozen.

21  Q    Did any of Ms. Doe's family members try to call her?

22  A    Yes.

23  Q    Who tried to call?

24  A    She has a younger sibling, a little sister that tried

25  calling.

1  Q    What happened when should would try?

2  A    Ms. Cros-Toure hung up on her.

3  Q    And how did Jane Doe find that out?

4  A    Her sister told her.

5          THE COURT:  All right.  Audience, no reacting.

6  Enough.  All right.  I know I'm the one facing you.  Everyone

7  else is facing forward.  But if I continue to see shaking of

8  the head or scoffing or laughing, you will be excused from the

9  courtroom.  Does everybody understand?

10     All right.  You may continue.

11          MS. BAILEY:  Thank you, Your Honor.

12 BY MS. BAILEY:

13 Q    Did Ms. Doe eventually learn how to use a tablet?

14 A    Yes.

15 Q    How did she do that?

16 A    She had eventually saved up some money.  One of the Toure

17 children helped her purchase it.  And she says that the two

18 youngest actually assisted her with learning how to use it.

19 Q    Prior to her having her own tablet, what did Ms. Cros-Toure

20 do when she would see Jane Doe using one of her children's

21 tablets?

22 A    Take it and hide it.

23 Q    I'm going to ask you a few questions now about physical and

24 emotional abuse, okay?

25 A    Uh-huh.

1 | Q    Was Ms. Doe emotionally and verbally abused at the

2 | Defendants' home?

3 | A    Yes.

4 | Q    Who did most of the verbal abuse?

5 | A    Ms. Cros-Toure.

6 | Q    What are some of the -- excuse me.  When did that verbal

7 | abuse begin?

8 | A    She can actually not recall a time that she wasn't berated.

9 | Q    What are some examples of the types of things that Ms.

10 | Cros-Toure would say to Jane Doe?

11 | A    She would call her a whore.  She would call her a slave.

12 | Tell her that she was worthless, that she needed to go back to

13 | Africa, that she didn't want to see her.  Some of the children

14 | relayed the same, told her nobody wanted her here.

15 | Q    And the verbal abuse did include some threats to send Ms.

16 | Doe back to Guinea, correct?

17 | A    Yes.

18 | Q    Did Ms. Cros-Toure ever say specifically that she would

19 | send Ms. Doe back just like she had sent the other girl back?

20 | A    Yes.

21 | Q    And your agents had an opportunity to speak with one of the

22 | Defendants' sons about whether or not they had other people in

23 | the home; is that correct?

24 | A    Yes.

25 | Q    And what did he tell you about other women, girls, who had

1  been in their home who worked?

2  A    That they had two prior to Jane Doe.

3  Q    Where were those two from?

4  A    One was from West Africa.  The other one's from Morocco.

5  Q    And were those women actually sent back to Africa?

6  A    Yes.

7  Q    Was Ms. Doe physically abused?

8  A    Yes.

9  Q    When did that abuse begin?

10 A    Shortly after she got to the house.

11 Q    What types of means were used to physically abuse her?

12 A    Hit with a belt, hit with cords, silent treatments, hair

13 pulled, ears tugged.

14 Q    And when you say cords, what kind of cords?

15 A    She described it as like the cord for an appliance.

16 Q    An electrical cord?

17 A    Like an electrical cord.  Sorry.

18 Q    I'm going to show you now Government's Exhibits 9 and 10.

19 Oh, and 11.

20 A    Thanks.

21 Q    Do you recognize these photos, Agent?

22 A    Yes.

23 Q    Did you take these photos?

24 A    Yes.

25 Q    What do we see in Photos 9 and 10?

1   A    The arm of Jane Doe.

2   Q    And what is shown on her arm?

3   A    Just kind of permanent scars and brui... like under-the-

4   skin bruising.

5   Q    What are those marks consistent with?

6            MR. PALMER:  Your Honor, I'm going to object that it's

7   speculation.

8            THE COURT:  You may rephrase your question.

9   BY MS. BAILEY:

10  Q    Agent, based on your training and experience, what do you

11  believe those marks were caused from?

12           MR. PALMER:  I'm going to object to her having the

13  lack of foundation to -- she's an agent, not a doctor.

14           THE COURT:  Were they consistent with the abuse that

15  was described to you?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  All right.

18  BY MS. BAILEY:

19  Q    So is your understanding that those marks were from the

20  electrical cord?

21  A    Yes.  Jane Doe would describe about how, when she would get

22  older, she would actually try to fight back, raise her arms,

23  try to actually grab the cord.

24  Q    What do we see in Photo 11?

25  A    That her left ear is split.

1   Q    And how did that happen?

2   A    She said that during an altercation with Ms. Cros-Toure,

3   that she got angry and ripped it out.

4   Q    Did Mr. Toure ever particulate in the physical abuse?

5   A    Yes.

6   Q    What were some of the things that he would do when he would

7   physically abuse Jane Doe?

8   A    During his interview with me, he admits to spanking her and

9   his other children.  Jane Doe relayed an incident where Ms.

10  Cros-Toure was trying to hit her with a cord or a belt, and she

11  was fighting back, so Mr. Toure intervened, sat on her so that

12  Ms. Cros-Toure could finish spanking her.

13  Q    Did the Defendants physically punish their daughters?

14  A    Not that we found evidence of.

15  Q    Was Ms. Doe ever banished from the Defendants' home as part

16  of a punishment?

17  A    Routinely.

18  Q    When did that begin?

19  A    Pretty early on.

20  Q    Where would she go?

21  A    When she was younger, when she first arrived, she would

22  just go to the backyard or to the garage, and then she

23  describes that Ms. Cross-Toure would come out and then tell

24  her, why are you still here?  I don't want to see you.  And

25  kick her off the property.  At which point she would run to a

 1  nearby park that was accessible from the end of their street.

 2  Q    Did people ever notice Ms. Doe in the park?

 3  A    Yes.

 4  Q    Did police officers ever notice her in the park?

 5  A    They were called to respond.  It's a -- it sounds like a

 6  maintenance crew from the park had encountered her and called

 7  the Southlake Police Department, described like a runaway,

 8  potential runaway child.

 9  Q    I'm going to come show you Exhibit 12.  Agent, do you

10  recognize this report?

11  A    I do, yes.

12  Q    And where did you get this report?

13  A    This was obtained by Southlake Police Department.

14  Q    Is it an offense report?

15  A    It is.  It is the officer that actually responded to the

16  call for a runaway child.

17  Q    What is the date of that call?

18  A    April 30, 2002.

19  Q    What did officer -- that officer of Southlake PD report

20  generally?

21  A    That he observed Jane Doe basically wearing dirty, unkempt

22  clothing and was visibly scared and nervous.  And she was

23  unable to provide where she lived or a contact phone number.

24  Q    Did she want him to take her back to the house?

25  A    No.

1   Q    Did he eventually take her back to the Defendants' home?

2   A    Yes.

3   Q    Who was home when he took her back?

4   A    Mr. Toure and Ms. Cros-Toure.

5   Q    Did either of the Defendants know Ms. Doe's date of birth?

6   A    No.

7   Q    Had they called the police about the runaway child?

8   A    No.

9   Q    How did Ms. Cros-Toure describe Ms. Doe's relationship to

10  her to the officer?

11  A    She said she was a cousin, that she had arrived a year

12  prior, and that they were in the process of adopting her.

13  Q    They were in the process of adopting her?  Okay.  In your

14  investigation, have you found any records like a reissued birth

15  certificate which might show that Jane Doe was, in fact,

16  adopted?

17  A    No.

18  Q    Have you found birth certificates for the Defendants'

19  children?

20  A    Yes.

21  Q    Have you been able to interview this officer recently?

22  A    Yes.

23  Q    Does he have an independent recollection of this incident

24  even 16 years later?

25  A    Yes.

1   Q   Did Ms. Doe ever see a doctor in the United States?

2   A   We know of one incident where she saw a doctor.  She was

3   not routinely taken to the doctor's office.

4   Q   Okay.  And did Mr. Toure affirm that as well in his

5   interview?

6   A   Yes.

7   Q   I want to ask you a few more questions about Ms. Doe's

8   escape.  Okay?  Did Ms. Cros-Toure ever allow Ms. Doe to work

9   for neighbors?

10  A   Yes.

11  Q   About how many times was she able to do that?

12  A   We estimate around a dozen or so.

13  Q   What were the parameters for Ms. Doe being able to work

14  outside the home?

15  A   Ms. Cros-Toure always had to approve ahead of time.

16  Q   Had to approve ahead of time?

17  A   Yeah.  And then she also had to -- like it had to be very

18  specific on when she was going to go, how long it was going to

19  take, when she'd be returning.

20  Q   In the span of the 16 years, at what point was Ms. Doe able

21  to go outside of the home to do this work?

22  A   It was only in the last few years.

23  Q   So towards the last half, --

24  A   Yes.

25  Q   -- the last part?  Okay.

1  A    In the latter half, yeah.

2  Q    About how much money would Ms. Doe make at each of these

3  jobs?

4  A    It's estimated between like $20 to $40.

5  Q    Was she eventually able to save money to buy herself a

6  tablet?

7  A    Yes.

8  Q    And how did she get that tablet?

9  A    One of the Toure children assisted her with purchasing it.

10 Q    Did she give them her money?

11 A    Yes.  She gave them --

12 Q    Okay.

13 A    She had saved up $60, gave them $60.

14 Q    What did she use that Kindle tablet for?

15 A    So, the other Toure children had received tablets and

16 Kindles and -- during Christmases and birthdays.  She was just

17 trying to catch up.  So she would -- describes that the younger

18 children had taught her how to do social media, create a

19 Facebook account, create an Instagram account.

20 Q    When did Ms. Doe begin to seriously consider escaping?

21 A    The summer of 2016.

22 Q    And what precipitated that?

23 A    She got in an altercation with Ms. Cros-Toure, had fled the

24 residence from the second floor, had made it to a park, stayed

25 with some witnesses, but then returned to the house.

1  Q   Why did she leave from the second floor?

2  A   Because she was chased up the stairs by Ms. Cros-Toure.

3  Q   How was Ms. Doe able to eventually escape?

4  A   So, she came back to the house.  The two witnesses had told

5  her that she needed to file some reports.  And she was just

6  scared, she didn't want to get anybody in trouble.  She also

7  felt close to the two youngest kids, wanted to go back to the

8  house.  But then she realized when she got back to the house

9  things had changed.  Ms. Cros-Toure did basically a silent

10 treatment with her, wouldn't let her go anyway, do anything,

11 touch anything.  And then at that point she -- around estimated

12 about a week or so, she made it out to the Starbucks with her

13 Kindle, got in touch with an old witness, relayed some of the

14 stuff that had been happening, and then an escape plan was

15 created.

16 Q   What day did Ms. Doe escape?

17 A   August 17, 2016.

18 Q   Where did Ms. Doe go and to whom did she speak?

19 A   She left the Southlake area and she was put in touch with a

20 nongovernment organization that deals with victims, and that --

21 yeah.

22 Q   And the case came to you from that referral?

23 A   And then, yeah, the case was then referred to the Human

24 Trafficking Task Force and then it was assigned to myself.

25 Q   Following her escape, did anyone file a missing person's

1   report on Jane Doe?

2   A    No.

3   Q    Have any members of the Toure or Cros family been in

4   contact with Mr. Doe's father back in Guinea since she escaped?

5   A    Yes.

6   Q    What was the conversation about?

7   A    It was to advise that she was no longer with the family and

8   ask for a cow back.

9   Q    Okay.

10            THE COURT:  Ask for a what?

11            THE WITNESS:  A cow.

12            THE COURT:  A cow?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  Okay.

15            THE WITNESS:  Yes, Your Honor.   Sorry.

16            MS. BAILEY:  I have no further questions, Your Honor.

17            THE COURT:  Cross-examination?  Mr. Wyatt or Mr.

18   Palmer, which would like to go first?

19            MR. PALMER:  I'll go first, Your Honor.

20            THE COURT:  Mr. Palmer, you may proceed.

21                            CROSS-EXAMINATION

22   BY MR. PALMER:

23   Q    Agent -- is it Langston?

24   A    Yes, sir.  Langston.

25            THE COURT:  Can you pull that microphone over?

1              MR. PALMER:  I'm sorry.

2              THE COURT:  That's all right.  There you go.

3  BY MR. PALMER:

4  Q    You've been -- can you hear me?  Hello?  There you go.

5  You've been a special agent for the Department of -- the State

6  Department, right, for --

7  A    Yes, sir.

8  Q    -- since 2011?

9  A    Uh-huh.

10  Q    And you have been at this particular task a hundred times,

11  given different investigations for a hundred times, about -- of

12  these types of cases?

13  A    The -- yes.  I either am the case agent, co-case agent,

14  asked to consult, or just asked to assist.

15  Q    This is your case?  You're not a co-agent, right?

16  A    The co-case agent has moved on to another assignment within

17  our --

18  Q    And who's that?

19  A    That's Zack Bowen, Special Agent Zack Bowen.

20  Q    Where is he now?

21  A    He is on his way to El Salvador.

22  Q    So, specifically, Jane Doe arrived at the -- was it the

23  YMCA?

24  A    Yes, sir.  Yes, sir.

25  Q    All right.  And that was all planned, correct?

1    A    What do you mean, planned, sir?

2    Q    That was part of the escape plan, as you called it?  She

3    was -- she contacted a person.  Who's the person she contacted?

4             MS. BAILEY:  Your Honor, at this time we would like to

5    keep the witnesses' names out of the hearing.

6             THE COURT:  All right.  Is there -- what's the basis

7    requested by the Government?

8             MS. BAILEY:  Your Honor, there's lots of press here

9    and we're -- we have some concerns about whether these

10   witnesses are going to be contacted and pressured, and we refer

11   to them all by witness number in the complaint.

12            THE COURT:  All right.  What's the -- what do you say,

13   Mr. Palmer?

14            MR. PALMER:  Well, we absolutely need to contact them,

15   as soon as possible.  But pressure, no.  I mean, that's -- Your

16   Honor, we have the right to be able to find out right now.  I

17   understand that discovery will be forthcoming, but it's an open

18   courtroom.  I don't understand what their concern really is,

19   but it's speculative that we're going to do something.  We just

20   want to find out what's going on here, Your Honor.  That's it.

21            THE COURT:  Do you have legitimate concerns of the

22   safety for these individuals?

23            MS. BAILEY:  Yes, Your Honor.  We know that the

24   Defendant has -- Mr. Toure has spoken to the family in Guinea.

25            THE COURT:  Uh-huh.

1              MS. BAILEY:  We know -- since she -- Jane Doe escaped.

2   He admitted that.  We know that they have a lot of resources.

3   So, yes, at this time we do have concern about contacting those

4   witnesses.

5              THE COURT:  Hold on.

6         (Pause.)

7              MS. BAILEY:  We're also going to provide complete

8   discovery very soon, so if that's the only purpose here, that's

9   going to be addressed very soon.

10             THE COURT:  Okay.  Well, I'm going to allow the

11  question.

12             MS. BAILEY:  Okay.

13             THE COURT:  The objection is overruled.  You may

14  proceed, --

15             MR. PALMER:  Thank you.

16             THE COURT:  -- Mr. Palmer.

17  BY MR. PALMER:

18  Q   Who is the person that Jane Doe contacted on her Kindle

19  from Starbucks using their WiFi?  Who is it?

20  A   Carnetta Shams.

21  Q   You're going to have to --

22  A   Sorry.  Carnetta Shams.

23  Q   Carnetta Shams?

24  A   Yes, sir.

25  Q   And is her son a friend of one of the boys?

1   A    Yeah.   She's a former neighbor.

2   Q    Okay.

3             THE COURT:   And let me say at this point, those of you

4   in the courtroom and obviously all the parties, if you hear

5   names today, you are not to contact these people and try to

6   talk to them other than through proper channels.   Any type

7   contact that's reported to this Court will bring serious

8   retribution.   Everybody understand?

9        All right.   You may proceed, Mr. Palmer.

10             MR. PALMER:   Thank you.

11   BY MR. PALMER:

12   Q    So Ms. Shams was contacted by Jane Doe.   Unsolicited, she

13   found her -- how did she find her?

14   A    So, she used to be very social with the Toures, good

15   friends with Ms. Cros-Toure.   And then they had their own

16   personal disagreement.   She always thought something was off.

17   She provided a business card with her phone number on it.

18   Q    Using the Kindle, she called her, like --

19   A    Yeah.

20   Q    -- instead of just a --

21   A    I think through Facebook.   With the messenger system, you

22   can place phone calls.

23   Q    All right.   So when you first got this case in September of

24   2016, you were aware that Jane Doe had an Instagram account,

25   correct?

1  A     At the -- yes.

2  Q     All right.  And did you view her Instagram account?

3  A     Yes, sir.

4  Q     All right.  You knew that she had a Twitter account?

5  A     Yes, sir.

6  Q     And you knew she had a Facebook account?

7  A     Yes, sir.

8  Q     All right.  So, and those, you can put a message out and

9  you could be -- you can talk to somebody in Guinea if you

10  wanted to, as long as they are your -- friends with you, right?

11  A     Yeah.

12  Q     Okay.  So she had the ability to communicate across the

13  country, across the world, starting when?

14  A      If we go off of -- it looks like her Instagram account was

15  created in like 2013.

16  Q     Okay.  So, some three years prior to her escaping, as you

17  claim, she had the ability to post pictures, comment on

18  pictures, correct?

19  A     Yes, sir.

20  Q     All right.  Do most of the subjects or the people that

21  you're investigating, when you get the contact from the YMCA,

22  for instance, do you find that they have social media?

23  A     In my trafficking cases?

24  Q     Yeah.

25  A     It's not abnormal, sir, no.

1  Q    It's not what?

2  A    It's not abnormal to have social media, no.

3  Q    Okay.  So you say it's normal to have social media for a

4  person that's being trafficked and being enslaved and forced to

5  work?

6  A    Well, they're viewed as a reusable commodity and they have

7  to have -- I mean, we do see the extreme situations where

8  they're chained up somewhere, but most of the time they still

9  need to be afforded some freedom so they can go do the chores

10 and whatever kind of job that you need them to.

11 Q    So, I noticed your 13-page complaint had no reference

12 whatsoever to her social media presence, did it?

13 A    Correct.

14 Q    So this plan gets hatched at the Starbucks for her to --

15 for this Ms. Shams to, what, to connect with Jane Doe and then

16 to go back to the house, get her stuff, travel documents,

17 things of that nature?

18 A    Yes.  Ms. Shams listened to Jane Doe's story, could recall

19 some incidences at the house that she had been there, and knew

20 that she hadn't gone to school.  Was putting into context stuff

21 that the Toures had told her, Mr. Toure and Ms. Cros-Toure.

22 She actually reached out to another witness.

23 Q    Who's that?

24 A    That's Bridget Ajuofu.  Ajuofo.

25 Q    Bridget -- can you spell it?

1   A    A-J-U-O-F-O, I believe.

2   Q    Okay.  So Shams talks to Bridget and they together help

3   Jane Doe leave Southlake?

4   A    They told her that she needed to get proof of life, so they

5   sent her back to the house, and then told her that they would

6   be in contact.

7   Q    Aren't they proof of life?

8   A    They believed that she needed to get something to show that

9   she had been in the house 16 years.

10  Q    Okay.  Well, we have plenty of pictures from Instagram

11  where she's posting.  Have you seen those?

12  A    Yes, sir.

13  Q    Okay.  And you would agree -- and we've got tons of them

14  here -- that they do not depict a person who is in any way

15  forced, enslaved, beaten, anything of that nature at all?  This

16  is a person who is independent, has hobbies.  Correct?

17  A    Uh, --

18  Q    Likes to eat -- likes to cook food?

19  A    That's -- what she would describe are those are the meals

20  that she had to provide for the family.

21  Q    So, these daily routines, you say -- well, let me go back

22  up.  When she got here, this Government's Exhibit #1, you agree

23  that that is not a depiction -- the picture is not a depiction

24  of the person that's on -- that actually traveled from Africa

25  to Dallas, Texas, or to DFW?  That's not her?  That's a -- this

1  is a six-year-old child and the person that traveled was about

2  12, about double the age.  Would you agree?

3  A    I'm sorry.  So, is your question that this isn't Jane Doe?

4  Q    Correct.  You don't -- you suspected early on that that was

5  not the proper -- the right photograph of her at the right

6  time?  Well, I mean, it may have been taken at some point in

7  time, but she was much older -- she didn't look like this when

8  she got here.  Correct?

9  A    Uh, --

10 Q    Let me just put it -- are you saying she was six years old

11 when she got here?

12 A    She was -- the documentation that was provided to -- for

13 her entry into the United States, her Guinea passport and her

14 United States visa, put her at six years old.

15 Q    I understand that.  But sometimes these things are not

16 necessarily correct.  Do you believe that to be true in this

17 situation, that they -- either there's some sort of forgery or

18 something is not right?

19 A    Uh, --

20 Q    She is not -- this -- the person that showed up and that

21 was contacted by the Southlake Police Department two years

22 later was not a six or eight-year-old?

23 A    I --

24 Q    It was a 12-year-old or a 10-year-old or --

25 A    Right.

1   Q    -- somebody much older?

2   A    That is what the -- the Toures said they did not know her

3   date of birth and they gave a 1990.

4   Q    Right.  So you have a footnote in your report about a birth

5   certificate obtained during the investigation lists a date of

6   birth of May 10th of '86.

7   A    Yes.

8   Q    And that mean she would have been 14 in 2000.

9   A    Correct.

10  Q    And how old which she be today?

11  A    Late 20s.

12  Q    And you've -- we've seen pictures of her on Instagram.

13  Does she appear to be late 20s to you?

14  A    I'm not a doctor.  I don't -- we attempted to obtain an age

15  range for her medically and we were unsuccessful.

16  Q    She's a grown woman today.  Right?

17  A    Yes, sir.

18         MR. PALMER:  May I approach?

19         THE COURT:  You may.

20  BY MR. PALMER:

21  Q    Seen that picture before?

22  A    No, sir.

23  Q    There's probably hundreds of pictures you haven't seen;

24  isn't that correct?

25  A    Uh, --

1    Q    Maybe thousands?

2    A    There weren't any in the house.  Maybe a handful.  But Ms.

3    Cros-Toure did tell us that she had a bunch on her phone.

4    Q    So, these days, people don't necessarily go to CVS and

5    print out pictures, do they?

6    A    Correct.

7    Q    Very often?

8    A    Right.

9    Q    They take them, put them up on the Cloud, they're on their

10   phone, they're on their tablets?  So, you didn't talk to any of

11   the Cros-Toure children prior to issuing an arrest warrant or

12   asking for an arrest warrant of their parents, did you?

13   A    Correct.

14   Q    You didn't talk to Mr. Cros-Toure or Ms. Denise Cros-Toure

15   before issuing or obtaining a warrant, did you?

16   A    Correct.

17   Q    Did you watch -- as a State Department official, did you

18   watch their travel?

19   A    Yes, sir.

20   Q    So, you spoke to Jane Doe in October of 2016, correct?

21   A    Yes, sir.

22   Q    All right.  She related to you that there was an argument

23   in -- on Father's Day?

24   A    Uh-huh.

25   Q    Okay.  Were you able to ascertain what the family did on

1   Father's Day?

2   A    Uh, --

3   Q    For Father's Day?

4   A    Well, the discussion was that she hadn't prepared a meal

5   yet for Father's Day.

6   Q    That's not the question I asked.  The question is, were you

7   able to ascertain what the family did to celebrate Father's

8   Day?

9   A    Oh.  No, sir.

10  Q    All right.  So she didn't tell you that they all went to a

11  restaurant?

12  A    No, sir.

13  Q    She is relating all of these details or facts and she's the

14  historian here, correct?

15  A    Yes, sir.

16  Q    And, of course, as any diligent agent, you want to

17  corroborate as much as you can, knowing that you probably can't

18  corroborate everything?

19  A    Correct.  Yes, sir.

20  Q    And that's when you reached out to Witness 1 through 6,

21  right?

22  A    Yes, sir.

23  Q    And we have identified -- which one is Ms. Sham?  Is that 1

24  or what number is she?

25  A    I don't have my case file with me, sir.

1              MR. PALMER:  May I approach the witness?

2              THE COURT:  You may.

3    BY MR. PALMER:

4    Q    Will the criminal complaint help you?

5    A    No.  I would need -- I apologize.  I would need my case

6    file.  We have them all numbered that way from when we -- it's

7    actually done by the order that we actually interviewed them

8    in, and those were not the first two that we interviewed.

9    Q    Did you review your case file prior to today?  I mean,

10   before --

11   A    Yes.  Yeah.  Yes, sir.

12   Q    You were there -- I talked to you on -- was it Wednesday

13   afternoon?

14   A    Yeah.  Yes, sir.

15   Q    You showed up at their house in Southlake unannounced,

16   correct?

17   A    With an arrest warrant.  Yes, sir.

18   Q    With how many federal agents or state agents or --

19   A    Roughly --

20   Q    Fifteen?

21   A    -- ten.

22   Q    All right.  Armed?

23   A    Yes, sir.

24   Q    Guns out?

25   A    No, sir.

1  Q    Didn't have a gun out?

2  A    No, sir.  When we approached the door, we did not have our

3  guns out.  We were admitted into the house, where we

4  encountered Ms. Cros-Toure.  She initially said that Mr. Toure

5  was not there.  Then she said -- she just said he was in the

6  United States.  We knew from surveillance he was physically in

7  the house.  We did have agents calling out.  She would not tell

8  us where he was in the house.  He would not respond.  That is

9  when agents, for their own safety, to do a perimeter sweep and

10  to find him, yes, pulled their guns out.

11  Q    He was in the bathroom?

12  A    He was in the bathroom.

13  Q    So this is all without warning, of course, taking them by

14  surprise, right?

15  A    Well, we waited until the two children that live in the

16  residence were gone.

17  Q    Right.  But you took the parents by surprise?  That's how

18  you do it?  Is that right?

19  A    Yes, sir.

20  Q    Okay.  So, when you got there, you wanted to see photo

21  albums?

22  A    We asked Ms. Cros-Toure for evidence related to -- she was

23  explaining to us that she had told us that the victim was 22

24  years old.  She explained to us that has lived a great life and

25  didn't understand why she was doing this.  And we asked where

1    such evidence would be.  And that's when she directed us to the

2    office.

3    Q    Right.  The picture I showed you, do you recognize which

4    picture the Jane Doe is, where she is in the picture?

5    A    Yes, sir.  Yes.

6    Q    All right.  Without turning it around and showing the

7    audience, would she be closest to your -- the second person

8    closest to your hand that you're holding with?

9    A    Correct.

10   Q    All right.

11   A    Uh-huh.

12   Q    And -- thank you.  And that -- do you know that she went on

13   -- she wasn't confined to the home, correct?

14   A    Right.

15   Q    She, in fact, ran?  She was a runner?

16   A    She is a runner.

17   Q    She told you that?

18   A    Yeah.

19   Q    And she -- do you have pictures of her with her FitBit or

20   whatever apparatus she had that tracked her mileage and her

21   time?

22   A    I believe it was a Nike Plus, from what she was --

23   Q    She told you about that?

24   A    Yes, sir.

25   Q    All right.  So she's out running the neighborhood?

1  A    Yes.

2  Q    Where'd she get the money for that?

3  A    One of the witnesses said she gave her like her old running

4  gear so that she'd have shoes and stuff.

5  Q    Over 16 years, she's getting old running gear from this one

6  witness?

7  A    No.  Jane Doe explained that she was given hand-me-downs,

8  and then during the holidays, like at Christmas, she wasn't

9  celebrated her birthday, but at Christmas she'd get a few

10  articles of clothing.  And then once she got older and was

11  permitted outside of the house and she would save up some

12  money, she was permitted to go shopping and get herself a few

13  things.

14  Q    She went shopping a lot, didn't she?

15  A    I don't know what the definition of a lot is.

16  Q    She would go to the airport to pick up Mr. Toure when he

17  would arrive back in America?

18  A    Potentially.

19  Q    Did she ever talk to you about that?

20  A    We didn't ask about that.

21  Q    All right.  So you're trying to get a feel for a life, 16

22  years of a life, and she's giving you these points along the

23  way which are the worst part, as according to her, right?

24  She's trying to explain how she was so abused and so

25  mistreated, right, and that's what you're taking notes?  All

1  right.  She's -- is that a yes?

2  A    Yes, sir.  Yeah.

3  Q    Yeah.  I have to have -- it's for the recorder.

4  A    Sorry.  Sorry.  Sorry, yes.

5  Q    You have -- she's telling you these people that have helped

6  her, that --

7  A    Right.

8  Q    -- are her allies, so to speak, and she's giving you their

9  names, and she's expecting them to corroborate her story,

10 right?  That's why she tells you who they are?

11 A    Well, in addition to the witnesses that we've sought out

12 ourselves, yes.

13 Q    Right.  But you had to start somewhere.  You start with her

14 giving a history, right?

15 A    Right.

16 Q    You go back to documents, passport, travel?

17 A    Uh-huh.

18 Q    Did you actually get the -- find the airline ticket from

19 Guinea to whatever -- was it directly -- it wasn't directly

20 from Guinea, was it?

21 A    No, sorry, it was Conakry to Houston and then Houston to

22 Dallas.

23 Q    Okay.  Did you find the ticket?  Did you find the -- any

24 payment?  Which airline it was?

25 A    No, sir.

1   Q    She didn't recall much, but something about a flight

2   attendant giving her a teddy bear and some cookies or something

3   like that?

4   A    It was a cookie and a toy.

5   Q    All right.  And this is, like, what, a 25-year flight?

6   A    Yes, sir.

7   Q    All by herself?

8   A    Yes, sir.

9   Q    No unaccompanied minor fare, what we have to do in this

10  country?  Did they have somebody like that?

11  A    This was pre-9/11, so we just aren't -- we were not as

12  meticulous with our documents.  We do know that she was sent to

13  secondary, where she was questioned by an officer, who said

14  that she did not speak any English but they could at least see

15  that she was destined for Dallas.

16  Q    Okay.  All right.  Why did it take you another two months

17  to interview her in 2016?

18  A    The case came to us -- she escaped and then it got referred

19  to us in September and then I believe our first interview with

20  her was in October.

21  Q    She said she escaped, but she -- she left?  I mean, you

22  call it escape.

23  A    Well, I mean, --

24          THE COURT:  Let's not argue over the words.

25          MR. PALMER:  Yes, sir.

1          THE COURT:  We're clear.

2    BY MR. PALMER:

3    Q    So, when you start these investigations, do you start with

4    the idea of supporting the allegation or do you look for signs

5    and evidence that the person could be fabricating these claims?

6    How do you do it?

7    A    You are going to typically take somebody's statement,

8    you're going to ask an array of questions, and then you're

9    going to try to find mechanisms to corroborate that.  So, when

10   she describes that she never went to the doctor, then we seek

11   to find -- when she says she never went to school, we then

12   found out -- we -- you then go and you pull the school records.

13   When she says that she was sent to a family over the summer

14   because she -- the entire Toure family went to France one

15   summer, we can show flight records that, yes, they all left one

16   summer.

17   Q    What family did she go to?

18   A    The Kah (phonetic) family.

19   Q    Over in North Richland Hills?

20   A    Yes.

21   Q    All right.  How old was she when that happened?

22   A    This was -- I believe it was like in 2003.  She would have

23   been around nine.

24   Q    Okay.  And was there an arrangement with the Kah family

25   that she work for them while she was -- while they were gone?

1    A    No.  She just frames that she actually tried to relay some

2    of the issues that she was having, and then that got relayed

3    back to the -- Mr. Toure and Ms. Cros-Toure when they returned,

4    which then made her a little apprehensive about seeking help

5    later.

6    Q    Did you talk to the Kah family before seeking an arrest

7    warrant for our clients?

8    A    No.

9    Q    Why not?

10   A    Because if they are close enough that the Toures would feel

11   comfortable leaving a child with them that has no status in the

12   U.S. that they're using as their servant, we did not feel that

13   we would get --

14   Q    You could have done -- do you have the power as a State

15   Department employee to cut off or stop someone from traveling

16   under their passport if they're under investigation?  I mean,

17   you could have come in to this Court and asked to have it seize

18   his passport pending an investigation?  I've seen it so many

19   times.  You haven't done that here.  Right?

20   A    Yes.

21   Q    Right.  You didn't do it, did you?

22   A    He had left the country by the time --

23          MR. PALMER:  Objection, nonresponsive.

24          THE COURT:  You've got to stand.  What?

25          MR. PALMER:  I'm sorry.  Objection, nonresponsive.

1           THE COURT:  Sustained.  Ask your question again.

2   BY MR. PALMER:

3   Q    Did you or did you not seek to suspend travel or restrict

4   travel by suspending or seizing a passport of either of our

5   clients at any time before seeking an arrest warrant?

6   A    No.

7   Q    All right.  So, at one point -- you said she -- Jane Doe is

8   now a conditionally -- what did --

9   A    It's called continued presence.

10  Q    She's allowed to have a continued presence now?

11  A    Yes.

12  Q    What is the -- tell the Court and tell us how long that

13  lasts for.

14  A    It's just a temporary immigration benefit for individuals

15  that have been identified as victims of trafficking, to allow

16  them, if they do not have status, to allow them temporary

17  status in the United States while we conduct our investigation.

18  Q    Okay.  So that temporary status has lasted almost 18

19  months?

20  A    You have to renew it every year.

21  Q    Well, but she has been given the status since -- when did

22  she get the status?

23  A    Once we conducted an interview and some initial

24  investigation and determined that, yes, she is potentially a

25  victim of human trafficking, is when we submitted the

 1  application.  So, I don't -- I'd have to go back into my notes

 2  and see when she was actually physically approved for it.

 3  Q    Do you have your file with you here?

 4  A    My file?  No, sir.

 5  Q    You came to a hearing in front of the federal magistrate

 6  without a file?

 7  A    Well, you'll have discovery soon.

 8  Q    Well, I'm not talking about -- I'm talking about today.

 9          THE COURT:  All right.  She doesn't have the file with

10  her.  Ask your question.

11  BY MR. PALMER:

12  Q    So, was the temporary, the conditional presence, continued

13  presence, --

14  A    Continued.

15  Q    -- was that issued in '16 or '17?

16  A    It'd be '16, basically.

17  Q    All right.  And it's been renewed at least once?

18  A    Yes, sir.

19  Q    And it continues to this day?

20  A    Yes, sir.

21  Q    Did she appear to know and appreciate that she would be

22  given some sort of status once she made this outcry or this

23  revelation to you?

24  A    She did not acknowledge that she knew or -- nor did she ask

25  about it.

1    Q    I'm sorry.  I apologize.  I was speaking to co-counsel.

2    A    All right.

3    Q    I'm sorry.  Can you say it -- can you repeat that?

4    A    She didn't ask or question about it.

5    Q    Did you inform her that's the process?  We will give you a

6    status of some nature, this continued presence, while this case

7    is pending?

8    A    Yes, sir.

9    Q    All right.  And if it's determined to be -- her claims are

10   -- continue to be -- are figured that this is not true, --

11   A    Uh-huh.

12   Q    -- what happens to her then?

13   A    Oh, no.  We could rescind it at any moment.  So, I mean, it

14   actually comes with the admonishment that she has to continue

15   to cooperate with the investigation.  And so it can be removed

16   if the -- if we determine the allegations can't be

17   substantiated or if the individual themselves doesn't become

18   cooperative.

19   Q    Okay.  So oftentimes that's what happens?  These -- they

20   start with a story and then sometimes the story changes?

21   A    Correct.

22   Q    All right.  And you would agree that the five best

23   witnesses that had a front-row seat for her 16 years are the

24   five children?

25           MS. BAILEY:  Well, Your Honor, I'm going to object to

 1  that question.

 2          THE COURT:  That seems argumentative.  I'm going to

 3  sustain that.

 4  BY MR. PALMER:

 5  Q   Do you believe that these -- the children, the Cros-Toure

 6  children, the Toure children, had a very good perspective of --

 7  involving -- being involved in her life while this was going

 8  on?

 9  A   Yes, sir.

10  Q   And you interviewed them all on Wednesday, --

11  A   That's right.

12  Q   -- this past week?  And you -- did you record those

13  interviews?

14  A   I believe the majority of them were.  There was -- I know

15  of one that wasn't, and it was the agents had forgotten the

16  audio recording.

17  Q   There are two agents that interviewed each of the children?

18  A   Different agents.

19  Q   Okay.

20  A   The children are -- don't all live together.

21  Q   Correct.  And they're not -- two -- some of them -- most of

22  them are adults?  There's only one that's a minor?

23  A   Correct.  We didn't interview the minor, sir.

24  Q   You didn't interview the minor at all?

25  A   No.

1  Q    Okay.  She told you that she was -- Jane Doe told you she

2  was closest with the minor, correct?

3  A    In terms of like her care and concern was for the two

4  youngest.

5            MR. PALMER:  May I approach?

6            THE COURT:  You may.

7            MR. PALMER:  Do I need permission to approach every time?

8            THE COURT:  No, you can have permission.

9  BY MR. PALMER:

10  Q   Do you see --

11           THE COURT:  Are these marked for identification purposes?

12           MR. PALMER:  No, they're not.  I'm going to have to after

13  --

14           THE COURT:  We have some stickers down here.  You can do

15  that.

16           MR. PALMER:  Yes, Your Honor.

17           MR. WYATT:  Maybe on a break.

18           MR. PALMER:  May I --

19           THE COURT:  You may.

20           MR. PALMER:  -- perhaps just show her, and then I'll start

21  marking them?

22           THE COURT:  You may.

23  BY MR. PALMER:

24  Q   Do you see the one, do you see this one?

25  A   Yes, sir.

   Q   All right.  This -- does it appear that Jane Doe is in that

1   picture?

2   A    Yes, sir.

3   Q    All right.  Does it appear that she is sitting at a dining room

4   table, eating a meal?

5   A    Yes, sir.

6   Q    That would be -- that would not support her contention that she

7   never sat at the table and had a meal with this family?

8   A    She says that it was during holidays and special events.

9   Q    Well, we can't tell from this picture if that's a holiday or

10  special event?

11  A    Correct.  Yes, sir.

12  Q    All right.  So she painted this picture that she was sort of

13  excluded from the big events?  She wasn't treated as like a normal

14  family member, correct?

15  A    I don't know what you mean by big events, sir.

16  Q    Well, I mean, did she go -- did she go to track meets?

17  A    As a viewer?  Yes.

18  Q    Yeah.  A spectator.  She's out, --

19  A    Spectator.

20  Q    She's out with the family.  Did she go on vacations with them?

21  A    Not the -- any of the overseas travel.

22  Q    That's not -- did they have domestic travel?

23  A    Sure.  Yeah.

24  Q    Did she go on any domestic travel with this family?

25  A    We believe so.

    Q    Where did she go?

1   A    We don't know.

2   Q    She didn't tell you?

3   A    Uh, --

4   Q    She didn't tell you that she went horseback riding in Arkansas

5   with the family?

6   A    It didn't come up in conversation.

7   Q    Florida?

8   A    Also did not come up in conversation.

9   Q    Austin?

10  A    We asked more about the travel that we could pull from -- all of

11  the five Toure children have United States passports and we can pull

12  everybody's travel, and that was the travel that we asked about.

13  Q    But you can -- are you discounting the fact that she could travel

14  domestically?

15  A    No, 'cause by her own admission, I mean, she went with the family

16  places.

17  Q    Right.  But you didn't inquire as to what those were and the

18  circumstances and the times and dates?

19  A    No, sir.

20  Q    Wouldn't that be important to establish a more comprehensive idea

21  and flavor for how this family interacted with her, instead of just

22  these allegations that she was beaten and screamed at and sat on and

23  whipped?  I mean, the whole picture is what you want, right?

24  A    Yes, sir.  Which is why we interviewed like other witnesses.

25  Q    And you would agree, even as we sit here today, you don't even

    have -- you have one picture.  You don't have the whole picture, do

1  you, Agent?

2  A    We describe investigations as a puzzle and we feel that, yes, we

3  have a pretty good -- we have a lot of the puzzle pieces, sir.

4  Q    You mention in your complaint that she was not allowed to swim,

5  she was not allowed to participate in physical activities with the

6  kids; is that correct?

7  A    No, we didn't -- sorry.  We said she could not swim.

8  Q    Right.

9  A    Her own admission is that she can't swim.  There is a pool at the

10  house.

11  Q    Right.  Your contention is, and you believed her, that she could

12  not swim?

13  A    Yes, sir.

14  Q    So if we have witnesses that say they swam with her for years,

15  that would not bode well for her credibility, would you agree?

16  A    I can't speculate on what would --

17  Q    Do you know a lot of people that don't know how to swim, they're

18  usually afraid of the water?

19  A    Well, no, they just don't go outside of where they can stand.

20  Q    Okay.  Do you know that she went tubing with this family?

21  A    Uh-huh.

22  Q    She told you that?

23  A    Yeah.

24  Q    Okay.  And she attended New Year's Eve parties with the family.

25  Are you aware of that?  Did she tell you that?

    A    She was -- she relayed that she was not confined to the house.

1   Q    Right.  So I just want to make sure the judge gets a full

2   understanding.  She was allowed to go -- she can do whatever she

3   wanted, really.  Run whenever she wanted --

4   A    Right.

5   Q    -- to run.  Right?  There was no set timetable for that.  Yes?

6   A    She would say that it's -- like she would either run with the

7   kids when they were training -- a lot of them did cross country -- or

8   was outside when she was -- outside of the time when she was working,

9   once she was done with her chores.

10  Q    But she worked from 6:30 until dark.  I mean, how did she fit in

11  a time to run during the daytime five miles or ten miles or whatever

12  she was running?

13  A    When her chores were done.

14  Q    But I thought you said it was -- it was six days a week, no days

15  off, --

16  A    But it's not continuous, is the way that she described it to us.

17  You would get stuff ready, then you'd have to clean the house, and

18  then the kids would come home, and then you would cook dinner, and

19  then there would be a pause.  I mean, we do know that she -- she

20  watched some TV, she relayed to us.

21  Q    She loved TV.  Right?  She loved *The Amazing Race*.  Right?  You

22  know that show on CBS?

23  A    We did not get into specifics of what she watches.

24  Q    Why didn't you get into specifics?

25  A    Because it was --

    Q    You had plenty of time, didn't you?

1   A    We have 16 years to cover, and there's some details.  For a

2   victim to recount all the instances they have, especially if they

3   have no concept of age and you're trying to pinpoint them, it can

4   become very stressed for them, so we don't -- we don't exhaust her in

5   interviews.

6   Q    How many interviews did you have with her?

7   A    I think we've had a half a dozen.

8   Q    Did she tell you about this picture?

9   A    Huh-uh.

10  Q    Does it look like she's an unhappy person in this picture?

11          MS. BAILEY:  Your Honor, I'm going to object.

12          THE COURT:  Well, yes, I'll sustain that objection.

13  But also, I need you to identify for the record so I can --

14          MR. PALMER:  Your Honor, --

15          THE COURT:  You know, "this picture" will never

16  translate to what we were shown.

17          MR. PALMER:  -- you're absolutely right.  I apologize.

18  We had a very short period of time to get all this together.  I

19  will --

20          THE COURT:  I completely understand.

21          MR. PALMER:  I'm going to mark this as Exhibit Number

22  -- I'm going to start now.  Number 7.

23      (Defendants' Exhibit 7 is marked for identification.)

24  BY MR. PALMER:

25  Q    Do you see -- do you see the picture that's now marked as

```
 1  #7?

 2  A    Yes, sir.

 3  Q    All right.

 4            THE COURT:   Okay.

 5  BY MR. PALMER:

 6  Q    Do you see her in the picture?

 7  A    Yes, sir.

 8  Q    All right.   Is she wearing a red bikini?

 9  A    Yes, sir.

10  Q    All right.   Does she look healthy?

11  A    Yes, sir.

12  Q    Is she smiling?   Somewhat?

13  A    Somewhat, yes.

14  Q    This looks to be on a lake somewhere?

15  A    Yes, sir.

16  Q    All right.   It does not look to be in anywhere North Texas

17  because there's hills.   But I don't know, maybe it's in Possum

18  Kingdom or -- I think it's in Austin.   I mean, there's a lot,

19  there's a lot of things to cover and you didn't get to cover

20  them all because she told you what she told you.   Right?   I

21  mean, whatever she told you were the story, and you went and

22  talked to these other witnesses, and they corroborated whatever

23  it was that they corroborated, that they could corroborate?

24  Correct?

25  A    Uh-huh.
```

1   Q   The people that you talked to were not family members?

2   A   Correct.

3   Q   Right.  So, I mean, I've got so many questions, literally,

4   I could be here all day with you, and I'm trying to wrap it up.

5   But when she allegedly jumped out of a second-story window,

6   which window did she jump out of?

7   A   I don't know.

8   Q   Did she describe which window she jumped out of?

9   A   No, but when I was interviewing Mr. Toure, he talked about

10  his oldest son being able to leave through the second floor, so

11  it does seem like it's physically possible.

12  Q   Well, I mean, anybody can jump out of a window.  I mean,

13  it's physically possible to jump out of a window.  So, she

14  didn't tell you -- I mean, how -- did she fall to the ground?

15  Did she -- how did it go?  I'm trying to understand how it

16  went.

17          THE COURT:  Was the phrase jumped out of a window what

18  she testified to on direct?  I just remember she left out of

19  the second floor, so I didn't hear that phrase.

20          MR. PALMER:  I thought she said leapt.

21          THE COURT:  So I want to make sure we're clear.

22          MR. PALMER:  I thought she said leapt, Your Honor, not

23  --

24          THE COURT:   Leapt?

25          MR. PALMER:  I thought it was leapt.

 1            THE COURT:  I thought I heard left out of the second

 2   story.

 3            MR. PALMER:  I may have --

 4            THE COURT:  All right.  Let's let the witness -- she's

 5   the one that can answer the question.  How did -- did she

 6   describe how she left the house?

 7            THE WITNESS:  She described it as a -- that she jumped

 8   out of the second floor.

 9            THE COURT:  Jumped out?  Okay.

10   BY MR. PALMER:

11   Q    Like open window, or she went through a closed window?

12   A    I would have to -- I cannot speculate.

13   Q    Well, but there were injuries that were apparently noted by

14   Witness #1 who she went to, correct?

15   A    Yes, sir.

16   Q    Did she describe the injuries that she saw that evening?

17   A    No, but she -- I would have to look at the report.  She did

18   notice enough that she thought that they should take photos,

19   and Jane Doe was too scared to get anybody in trouble.

20   Q    Did she -- was she nervous enough about these injuries that

21   she wanted to take her to an emergency care or a physician?

22   Was she bleeding, in other words?

23   A    Not that I believe, sir, no.

24   Q    So the injuries were noticeable but not needing of

25   emergency care?

1   A   Correct.

2   Q   All right.  You asked about medical care and you talked

3   about one situation involving a dental situation?

4   A   Yes, sir.

5   Q   All right.  And did you -- were you able to ascertain

6   through the medical -- did you get the medical records?

7   A   Yes, sir.

8   Q   Were you able to ascertain the dentist, the family friend

9   that they -- that Denise Cros-Toure took Jane Doe to the night

10  before they went to the medical school to get the tooth taken

11  care of, who that person was?

12  A   I believe it came up in one of the interviews of one of the

13  children.

14  Q   Okay.

15  A   I believe somebody had sent that to us.

16  Q   Okay.  So the children that you interviewed last Wednesday?

17  A   It either came from them or one of the witnesses gave us

18  the name.  We just pulled the -- I was able to pull the records

19  from the A&M School of Dentistry where Mr. Toure took her and

20  gave a date of birth of like '91.

21  Q   All right.  Did you talk to any other witnesses other than

22  Witness 1 through 6 that you didn't identify in the complaint?

23  A   Yes.

24  Q   Did you talk to a Kelly Meehan?

25  A   I believe they were recently spoken with.

 1  Q    Sure you didn't talk to Kelly Meehan back in '16?

 2  A    I'm not sure.

 3  Q    All right.  And Kelly Meehan essentially told you this is

 4  ludicrous, didn't she?

 5  A    I don't recall.

 6  Q    You don't recall talking to her recently?

 7  A    I would have to look at my notes.  It's -- we've spoken

 8  with a lot of neighbors.

 9  Q    Okay.  And a lot of neighbors don't support this theory, do

10  they?  Or your -- the allegation?  A lot of them don't?

11          MS. BAILEY:  Your Honor, I'm going to object to this.

12          THE COURT:  What's the basis?

13          MS. BAILEY:  It's argumentative at this point.

14          THE COURT:  Overruled.

15  BY MR. PALMER:

16  Q    Is that a fair characterization of your multiple

17  interviews, that many of the neighbors do not support the

18  allegation that forms the basis of this complaint?

19  A    The ones that we've talked to said that the Toure children

20  called her a slave.  We talked to ones that described meeting

21  her when she was walking the younger kids to and from school or

22  at the bus station and would describe like worn -- like,

23  clothes that didn't seem to fit.  And so I would not say that

24  -- I would say the ones that we talked to just continued to

25  corroborate what was going on.

1  Q    I'll show you what's about to be marked as Exhibit #1.  Do

2  you see this picture?

3  A    Uh-huh.

4  Q    Does this look like a wedding photo or of something, an

5  event, like she was taken to a large event?  I mean, do you

6  have any idea?  Did she tell you about a wedding in Burleson,

7  Texas?

8  A    Potentially.  I know -- the dress, I believe, is the one

9  that she mentioned wearing to like a graduation, but --

10 Q    Okay.  This looks like a pretty nice dress, huh?

11 A    Uh-huh.

12 Q    Earrings?  It looks like her hair is done for this event.

13 I mean, she looks like she's put together pretty well.  Would

14 you agree?

15 A    Yes, sir.

16 Q    Does this look like a person that has been deprived or has

17 been forced or enslaved, not taken into a large -- I mean, if

18 this is a wedding and there's a lot of people there.

19         MS. BAILEY:  Objection.  Speculation, Your Honor.

20         THE COURT:  Overruled.

21 BY MR. PALMER:

22 Q    Did she tell you about that wedding?

23 A    No, sir.

24 Q    Did she tell you about the time that she verbally berated

25 for nine to ten minutes one of the cousins?

1   A   No, sir.

2   Q   Omar?  Did she tell you about Omar?

3   A   I know of a few Omars, but I'm not sure.  I believe there's

4   an Omar Kah and I believe that was a cousin.

5   Q   No, that's -- we're not talking about the same Omar.  So

6   you're telling this Court that there are State Department

7   officials that went to interview her father in Guinea?

8   A   Yes, sir.

9   Q   All right.  And when is the last time they interviewed the

10  father?

11  A   I'd have to pull the report.

12  Q   Was it recently?

13  A   I believe so.

14  Q   Did you let them know that this was about to happen?

15  A   No.

16  Q   Okay.  Is he on board with this?  Do you understand what

17  that means?  Does he -- is he in favor of prosecuting the

18  Toures?

19  A   That's not really his decision.

20  Q   I'm sorry?

21  A   That's not really his decision.

22  Q   I'm asking you, did he voice an opinion?

23  A   I do not believe so.

24  Q   Okay.

25  A   Or one was not noted in the report.

1  Q   All right.  The Cros-Toure children are not citizens of

2  Guinea, are they?

3  A   Correct.

4  Q   And did you or any of your agents talk to the consulate or

5  the embassy of Guinea in the United States to see if there was

6  any correspondence between the Cros-Toures and -- and the

7  Toures with the consulate or the embassy to establish some

8  procedure to get her back to Guinea?  Back in '16?

9  A   (no immediate response)

10  Q   Did you understand the question?

11  A   No, sir.

12         THE COURT:  I don't think I understood the question.

13         MR. PALMER:  Okay.

14         THE COURT:  Could you ask it again?

15         MR. PALMER:  Yeah.

16  BY MR. PALMER:

17  Q   Did -- well, did anybody contact the consulate or the

18  embassy?  We have an -- they have an embassy in New York,

19  right?

20  A   Yes, sir.

21  Q   All right.  Did you --

22  A   In D.C.

23  Q   There's something in New York.  Do you know what it is?

24  A   The consulate.

25  Q   Okay.  Did you or your team contact the Guinea consulate or

1  embassy to determine whether or not the Toures had made contact

2  with them to establish some procedure or some initiative to get

3  her back to Guinea back in '16?

4  A   No, sir.

5  Q   All right.  Do you understand, based on your interviews,

6  that they were trying to return her back to Africa?

7  A   Mr. Toure in his interview explained that to us, yes.

8  Q   All right.  Did my client, Ms. Denis Cros-Toure, give you

9  an interview?

10 A   No, sir.

11 Q   Did you ask her for an interview?

12 A   Yes, sir.

13 Q   No?

14 A   Yes.  No, we asked.

15 Q   Okay.  And then at some point she was allowed to make a

16 phone call and she called me?

17 A   Yes, sir.

18 Q   Okay.  I didn't know what happened prior to that because I

19 wasn't there.

20 A   No, we -- post-arrest, we provided the Miranda waiver and

21 then Mr. Toure waived, he spoke with agents, and then she did

22 not waive.

23 Q   So your understanding is, through Mr. Toure, that the

24 family was attempting to send Jane Doe back to Guinea?

25 A   He was talking about sending her to Dakar to get some

1   sewing schools so that when she did go back she could be -- so

2   that she would have skills when she went back.

3   Q    You know that she was a sewer in the United States?  She

4   had a sewing machine that was given to her by Ms. Cros-Toure?

5   A    I think it was described as like a small -- yeah.

6   Q    Okay.

7   A    Small.

8   Q    And another friend of theirs, Cindy Fentriss, gave her a

9   sewing machine as well?

10  A    Okay.

11  Q    Did she tell you about Cindy?

12  A    No, sir.

13  Q    Did -- you also knew that she liked to draw and she was

14  very creative with her hands?

15  A    Uh-huh.

16  Q    She liked to garden?

17  A    I wouldn't say she likes to garden, but she would garden,

18  yes.

19  Q    That's what she told you?  She told you she didn't like to

20  garden but she was forced to mow the lawn and do all these

21  chores that she didn't like to do, right?  That's what she told

22  you?

23  A    I can't speculate whether she likes them or not.  We just

24  know that this is what she believed were her responsibilities.

25  Q    Why did she believe they were her responsibilities?  Were

 1  they told by the adults that these are your responsibilities or

 2  did she --

 3  A    Yes.

 4  Q    -- just end up doing them?

 5  A    No.  She grew up, and as she got older, she relayed that

 6  this is, as she got older, kind of more things were turned into

 7  her responsibility.

 8           THE COURT:  Did other people in the household perform

 9  those same jobs, mowing the lawn, doing the gardening, cleaning

10  the house?

11           THE WITNESS:  She will say that everybody had chores

12  but she predominately did the majority of them, and I think --

13  I believe a few of the Toure children like relayed the same,

14  but through some of the neighbors' interviews, what people

15  recall is that she always seemed to be doing it and

16  occasionally they would see other people but the majority of

17  the time it seemed to be her.

18           THE COURT:  Okay.

19  BY MR. PALMER:

20  Q    She also had more time to do those things?  While the kids

21  are at school, she would be at home --

22  A    Not going to school.  Yes, sir.

23  Q    Right.  Well, let me ask you about that, because I know

24  that's a big topic.  Or at least you made mention of it in your

25  report.  How would a person in the Toures' position -- now, she

1  came here in 2000, correct?

2  A    Uh-huh.

3  Q    They didn't get their LPR status until 2005; is that right?

4  That's what you wrote in your report?

5  A    Then, yes.

6  Q    I mean, you have access to all these documents?

7  A    Oh, yes, sir.

8  Q    You're the federal government, right?  Knowing that they

9  don't have their status fully intact until 2005, so five years

10 subsequent to her arriving in this country, how would a person

11 like these folks walk into Southlake Carroll or the Carroll --

12 the Southlake ISD or --

13 A    Uh-huh.

14 Q    Is it Carroll ISD?

15 A    Carroll.  Carroll ISD.

16 Q    How would you put that person in school without a birth

17 certificate?

18 A    Well, you also --

19         THE COURT:  Hold on.

20         THE WITNESS:  You actually just need something with a

21 name and a birthday, so a passport is actually --

22 BY MR. PALMER:

23 Q    You're saying that you can just walk in with a passport and

24 say, this is my child?  There's no adoption records, no

25 guardianship papers, no shot records, none of that stuff.  She

 1  doesn't have -- they don't have any of that.  Just for, in this

 2  hypothetical, how do you enter that person into school?

 3  A    It's different for school districts, but I -- we do know

 4  that you -- it's a -- for a child to be -- one of the basic

 5  things is what is their name, what is their age, and a passport

 6  actually is an acceptable form of identification to establish

 7  age and name.

 8  Q    Well, are you telling this Court that --

 9         THE COURT:  Let's move on from this line of

10  questioning.

11         MR. PALMER:  All right.

12  BY MR. PALMER:

13  Q    Did you preserve and capture all of her social media at the

14  time you met her?

15  A    Yes, sir.

16  Q    That's going to be part of discovery?

17  A    Uh-huh.

18         THE COURT:  Is that a yes?

19         THE WITNESS:  Yes, sir.  Yes.  Sorry.

20  BY MR. PALMER:

21  Q    Does she have -- did you tell her not to engage in social

22  media during the pendency of this case?

23  A    Yes.

24  Q    So far, do you know that she -- if she's been compliant

25  with that?

1  A    We believe she has.

2  Q    All right.  So everybody was disciplined in the house?  All

3  the children were disciplined?

4  A    Various forms, yes.

5  Q    Everyone did chores, right?

6  A    Some level, yes.

7  Q    Everybody ate their meals?

8  A    Yes.

9  Q    Not all together necessarily, because children don't always

10 eat together, do they?

11 A    True.

12 Q    They had a lazy Susan on the table.  Did you see it when

13 you went to the house?

14 A    Yes, sir.

15 Q    So they're not all seated at the same table at one meal?

16 Families just don't always do that, do they?

17 A    Yes.

18 Q    She was not deprived of any food or any meal?  She didn't

19 skip a meal, did she?

20 A    Huh-uh.  No, sir.

21 Q    Okay.

22        MR. PALMER:  Your Honor, at this time, I will pass the

23 witness to --

24        THE COURT:  Mr. Wyatt?

25        MR. WYATT:  Thank you, Your Honor.

1          THE COURT:  Try not to overlap, if you can.

2          MR. WYATT:  I'll try.

3          THE COURT:  Thank you.

4                          CROSS-EXAMINATION

5    BY MR. WYATT:

6    Q   I want to move directly to what happened in Houston.  Who

7    picked her up from the Toures' house before she went to

8    Houston?

9    A   It was a combination of Carnetta Shams and Bridget Ajuofo's

10   daughter.

11         THE COURT:  Oh.

12         THE WITNESS:  Pardon?

13         THE COURT:  No.  I was just (overspoken) the

14   microphone.

15   BY MR. WYATT:

16   Q   Okay.  Did they pick her up at the Toures' house in a car?

17   A   Yes.

18   Q   Okay.  But she also -- you said that she contacted them

19   from the Starbucks, correct?

20   A   Yes.

21   Q   So she used to walk to that Starbucks all the time, right?

22   A   Yes, sir.

23   Q   Okay.  And as a matter of fact, she spent a lot of time at

24   that Starbucks, didn't she?

25   A   I don't know what your definition of a lot is.

1  Q   Well, I mean, I go to Starbucks, you know, there's one

2  right by my office.  I go once a day and I spend 15 minutes in

3  there.  She was up there on her tablet, walking to that

4  Starbucks at least once a day, wasn't she?

5  A   I'm -- I don't know.

6  Q   Well, that's what it's going to show from the forensic

7  downloads that you all have done of her tablet, right?  You can

8  tell where she was, what WiFi she was using, during those times

9  that she was reaching out to people, right?

10 A   Yes.

11 Q   And you've reviewed those before you came in here today,

12 right?

13 A   No.

14 Q   Okay.  So you haven't looked at any of that about whether

15 or not she could leave the home, how long she could leave the

16 home from, or where she could go on a daily basis?  Did you

17 review all that before you came in here today?

18 A   No.

19 Q   Okay.  But she could do all those things, couldn't she?

20 A   Yes.

21 Q   She could leave the home anytime she wanted, right?

22 A   No.

23 Q   Okay.  So -- well, I thought you said that she could go to

24 Starbucks any time she wanted?

25 A   No, I -- it's -- she had to get permission from Ms. Cros-

 1   Toure if she wanted to leave the house.

 2   Q    Okay.  So she had to get permission from Ms. Cros-Toure to

 3   go running?  Is that correct?

 4   A    If it was in the neighborhood -- the specifics of if she

 5   had left and had to go to the grocery store or to Starbucks,

 6   she related that she had to get permission.  If she's just

 7   outside the house running in the neighborhood, I'm not sure.

 8   Q    Okay.  So outside the house is kind of the phrase that I'm

 9   focusing on.  You can tell, right?

10   A    Yes.

11   Q    Okay.  Slaves aren't allowed to go outside the house, are

12   they?

13   A    (no immediate response)

14   Q    I mean, part of being a slave is being held against your

15   will, correct?

16   A    The mechanism for the --

17   Q    It's a yes or no question, Agent.

18             THE COURT:  Hold on.  Let her --

19             MS. BAILEY:  Your Honor, this is not --

20             THE COURT:  Hold on, everyone.

21             THE WITNESS:  Sorry.

22             THE COURT:  Let her answer the question.  And answer

23   the best you can.  So, rephrase your question and let's do it

24   again.

25   BY MR. WYATT:

 1  Q   Is part of being a slave being held somewhere and not being

 2  free to leave?

 3          MS. BAILEY:   Your Honor, the charges here are not

 4  slavery.

 5          MR. WYATT:   They've used -- Your Honor, they've used

 6  that phrase before.

 7          THE COURT:   The phrase has been used, so I'm going to

 8  allow him to ask her understanding of that use of the phrase in

 9  the context of his question.

10  BY MR. WYATT:

11  Q   You can answer.

12  A   She was led to believe that she was a family member.

13  Q   Not a slave?

14  A   Not a slave.

15  Q   Okay.  And her actions speak exactly to that, correct?

16  That she was able to leave the house, that she was able to go

17  on runs, that she was going on vacations with the family,

18  correct?

19  A   She can recognize that she was a family member but --

20          MR. WYATT:   Objection, nonresponsive.

21          THE WITNESS:   -- she was not treated equal.

22          MR. WYATT:   Yes or no question.

23          THE COURT:   She's going to -- look, we're not going to

24  play that third-year law school game of she's not saying yes or

25  no.  I'm here to hear the answers.  And if she runs on it, then

 1  you can tell, you can object.

 2          MR. WYATT:  Thank you, Your Honor.

 3          THE WITNESS:  Okay.

 4          THE COURT:  But let her answer the question to the

 5  best of her ability .

 6  BY MR. WYATT:

 7  Q   Go ahead, Agent.

 8  A   What was the question again, sir?

 9  Q   She was free to go?  She went -- she went with the family

10  on vacations, correct?

11          MS. BAILEY:  Your Honor, I'm going to object to asked

12  and answered.

13          THE COURT:  No.  He didn't -- she didn't answer.

14          THE WITNESS:  No, sorry, I didn't know what that

15  question was.

16          THE COURT:  So we're going to ask the question, answer

17  it, and let's go forward.

18  BY MR. WYATT:

19  Q   She was allowed to go on the family vacations, correct?

20  A   Yes.

21  Q   Okay.  She went on the family vacations, correct?

22  A   The ones within the United States, yes.

23  Q   Okay.  All right.  So, in this situation, we've got a

24  person who does family chores, correct?

25  A   Yes, sir.

1    Q    Just like all the other kids, right?

2    A    More so.  Yes.

3    Q    Okay.  But the same types of chores, right?  Mowing the

4    lawn, doing gardening, cleaning up the house?  You're just

5    saying that she does more work than the other children.

6              THE COURT:  Now, that, we have all talked about, so I

7    think I've got a picture of that.

8              MR. WYATT:  Okay.  Thank you, Your Honor.

9              THE COURT:  You can move on.

10   BY MR. WYATT:

11   Q    So, where -- when she left for Houston, where did she go?

12   A    She is with one of -- we typically don't tell where the

13   victim is living.

14             THE COURT:  Wait.  I'm sorry.  What's the time frame?

15             MR. WYATT:  When she left -- back in 2016.  When she

16   left, where did she go?

17             THE COURT:  Okay.

18             THE WITNESS:  To a residence in Houston.

19   BY MR. WYATT:

20   Q    Okay.  So she didn't go to the YMCA in Houston?  She went

21   to a residence in Houston?

22             MS. BAILEY:  Your Honor, I'm going to object to

23   relevancy for the purposes of this hearing.

24             THE COURT:  Okay.  What is the relevance?

25             MR. WYATT:  The relevance is I want to establish if

1  she had places to go, Your Honor, if she had contacts outside

2  the home, or was this somebody who was so destitute that she

3  had to go straight to the YMCA.

4         THE COURT:  I'll allow the question.

5  BY MR. WYATT:

6  Q   Go ahead, Agent.

7  A   I'm so sorry.  What was the question again?

8  Q   When she left initially from Houston from the Toures'

9  house, did she go to a residence or did she go straight to the

10  YMCA?

11  A   She was taken to a residence.

12  Q   Okay.  So when you're talking about the YMCA in the context

13  of this, did -- how does the YMCA fit into this investigation?

14  A   So, it's YMCA International Services.  It's not the gym.

15  So they actually provide services to trafficking victims,

16  various refugees, and they are the head NGO in the Houston

17  area.  So if you did a Google search of who to seek assistance

18  for for a potential trafficked individual, this is the number

19  that you would give.

20  Q   Okay.  So she went from the Toures' house to a residence in

21  Houston, correct?

22  A   Yes, sir.

23  Q   And at any time, was she taken out of that residence and

24  placed somewhere else?

25  A   No, sir.

1  Q    Okay.  So she stayed in that residence the whole time?

2  A    Yes, sir.

3  Q    Okay.  All right.  So when you're talking about the social

4  media and kind of telling her not to use social media, when did

5  you first tell her to stop using social media?

6  A    It was after one of the initial interviews.

7  Q    Why did you tell her to stop using social media?

8  A    We were -- she is uneducated.  We feel that she is

9  vulnerable to being influenced.  And we -- when you would ask

10 her about the individuals on her like friend list, she -- if

11 somebody tried to friend her, she would just accept it, and we

12 did not want her to fall victim to a different type of -- to a

13 different issue.

14 Q    When she left the home in Southlake, she took her clothes

15 with her, right?

16 A    Yes.

17 Q    Okay.  She took some documents with her also?

18 A    She had recovered her passport and her vaccination records

19 and some photos.

20 Q    What other -- were there any other documents that she took

21 with her when she left the Toures' home?

22 A    A birth certificate that she was -- had been mailed.

23 Q    Okay.  No documents from the consulate in Guinea?

24 A    No.

25 Q    Or the consulate from -- my understanding is there's a

1   consulate for Guinea in New York and in Houston, correct?

2   A   I am not familiar with the consulate in Guinea, but there

3   might be.

4   Q   Okay.  Were there any documents that you saw that were

5   provided to you by Jane Doe from the consulate of Guinea?

6   A   No, sir.

7   Q   So, during any of the interviews with her -- you said there

8   were about half a dozen?

9   A   Yes, sir.

10  Q   Did you record all those interviews?

11  A   No, sir.

12  Q   Okay.  Did you record any of the interviews?

13  A   I do not believe so.

14  Q   And why wouldn't you record any of those interviews?

15  A   Not common practice for victim interviews.

16  Q   Did she ever -- at any time, did Jane Doe ever tell you

17  that she did not want to go back to Guinea?

18  A   Yes, sir.

19  Q   When did she tell you that?

20  A   I mean, this has always been the discussion as part of her

21  recovery, of what does she want to do.  So there has been the

22  discussion if she wants to go back and she has relayed she --

23  as she describes, that Ms. Cros-Toure and Mr. Toure are the

24  only parents she's ever known.  This was what she thought was

25  like a family.  And she has no knowledge or any information

1    about Guinea.

2    Q   Did she ever give you -- when we talk about the abuse that

3    you're saying that she suffered, did she ever give you any

4    specific times, specific dates, of anything that she can point

5    to and say, on this date, this was Christmas Day 2009 where I

6    was abused and this is how I was abused?

7    A   Well, as I mentioned earlier, sir, like when we tried to

8    get some of those specifics, since she had never celebrated her

9    birthday and has no -- was kind of never educated with

10   calendars and that kind of stuff, she just isn't able to.

11   Q   She can read and write, though, can't she?

12   A   She does not have a strong command of the English language.

13   Q   Okay.  Have you ever seen any videos of her from the Toure

14   house that shows her speaking?

15   A   No.

16   Q   What about any videos from the Toures' house either she or

17   the other kids made of her arguing with her parents or with the

18   Toures or with the other children in the home?

19   A   We do have a recording of her in a disagreement with Ms.

20   Cros-Toure and Mr. Toure and one of the Toure children as part

21   of --

22   Q   And people have disagreements with the brothers and sisters

23   all the time, don't they?

24   A   Uh-huh.

25   Q   And they have disagreement with the parents all the time,

1   don't they?

2   A    Yes, sir.

3   Q    Okay.  I mean, so what I'm saying is if you take a specific

4   incident on a specific day, there are times when we're all not

5   real proud of the way that we've acted toward our children or

6   toward our parents, right?

7   A    Yes.

8   Q    Okay.  I mean, I've done things I'm not proud of.  I stole

9   the car and left when I was 16 years old.  Things like that,

10  right?

11            MS. BAILEY:  I'm going to object.  Relevancy.

12            THE COURT:  Yeah.  Don't make those admissions in

13  court.

14            MR. WYATT:  Yeah.  I mean, the statute's run on that,

15  Your Honor.

16            THE COURT:  Even so.

17  BY MR. WYATT:

18  Q    So, so --

19            THE COURT:  And your line of questioning is becoming a

20  little argumentative, so just go ahead and wrap up your point.

21            MR. WYATT:  Yes, Your Honor.

22            THE COURT:  Okay.

23  BY MR. WYATT:

24  Q    And the point is, is that if you take a specific instance

25  on a specific day, it can make anybody look bad, right?

1    A    Yes.

2    Q    Okay.  Did you ever see any videos of her doing karaoke in

3    English?

4    A    No, sir.

5    Q    Okay.  Did she ever tell you about any of the karaoke

6    parties that she went to with the Toures and their children?

7    A    No, sir.

8    Q    Okay.  Did she tell you that she had a bicycle?

9    A    We know that she rode a bike.  She didn't -- she taught

10   herself how to ride a bike.

11   Q    Okay.  But there were bicycles available to her at the

12   house at any time, right?

13   A    Yeah.

14   Q    Okay.  So if she was going to -- if she really wanted to

15   leave at any time, she could either run away, right, because

16   she was a runner, or she could get on a bicycle and leave,

17   right?

18   A    The -- this question was raised with her multiple times.

19   She has nowhere to go.

20   Q    Where did she want to go?

21   A    She was taught French at the house, and so at one time she

22   speculated, not knowing, thought that she could go to New

23   Orleans because she felt that she could speak the language.

24   Q    She was taught French by whom?

25   A    She was taught -- in the house.  The Cros-Toures and Mr.

1    Toure speak it.

2    Q    Did she ever talk to you about any kind of other education,

3    like Hooked on Phonics, that she did in the house with the

4    youngest Toure child?

5    A    When she was caught with the Hooked on Phonics, it was

6    taken away from her.

7    Q    Caught by whom?

8    A    Ms. Cros-Toure.

9    Q    And when you said that she had a tablet, she had her own

10   Kindle, when did she purchase that Kindle tablet?

11   A    I'm not -- we're not sure of the exact date.  We're trying

12   to -- we're still trying to pull those records.  We know her

13   earliest post was like in 2013.

14   Q    So that'd be five years from now?  Five years prior to now?

15   A    Three years -- yes.  Yes.

16   Q    Three years prior to the time that she left the Toures'

17   home?

18   A    Yes, sir.

19   Q    Okay.  So she had a -- you know for a fact that she had a

20   tablet or access to a tablet for three years?

21   A    Yes, sir.

22   Q    Okay.  Do they have WiFi in the house?

23   A    I don't know.

24   Q    Did she communicate with other people besides the Toures or

25   their children on that tablet?

1   A    I don't know if we've seen communications with her and any

2   of the Toures.  So, I'm -- there are some communications with

3   other individuals.

4   Q    And I think I asked you this before, but you've done a

5   forensic download of that tablet?  Is that correct?

6   A    Yes.  I believe so.

7   Q    Okay.  Did she have an email address?

8   A    She does, but she can't remember it.

9   Q    Okay.  So, did she set up her own email address or did

10  somebody help in the Toure home set up the email address?

11  A    Just like the social media account, she says it was the two

12  younger kids.

13  Q    When she was out running, did she ever run to the gym and

14  work out?  There's a gym close by, a 24-Hour Fitness, isn't

15  there?

16  A    I don't know.

17  Q    Did she ever go to a country club that was nearby that

18  house?

19  A    I don't know.

20  Q    Okay.  Did she ever tell you about her access to the

21  country club that the Toures provided?

22          MS. BAILEY:  Your Honor, --

23          THE WITNESS:  We didn't ask.

24          MS. BAILEY:  -- I'm going to object to relevancy at

25  this point.

 1           THE COURT:  Well, I get his line of questioning, and

 2   at some point you're overdoing it, but --

 3           MR. WYATT:   Yes, sir.

 4           THE COURT:  -- go ahead and make your point.

 5   BY MR. WYATT:

 6   Q   Okay.  If you know, Agent, please answer the question.

 7   A   We didn't ask those questions.

 8   Q   Okay.  So you didn't ask questions that relate directly to

 9   her access to be around other people or her access to private

10   areas, such as clubs or to gyms, things like that?  You didn't

11   ask those questions?

12   A   No, sir.  Our line of questioning was more why didn't she

13   feel comfortable at certain stages to reach out to people.  Not

14   the specifics of who she encountered on a day-to-day basis and

15   --

16   Q   Well, there are some specifics about who she encountered on

17   a day-to-day basis, correct?

18   A   In terms of--?

19   Q   About Witness 1, Witness 2, Witness 3.  And those were --

20   were those daily interactions with those witnesses, as best

21   you've been able to determine?

22   A   Some seemed pretty routine, like when the younger kids

23   needed to get taken to the bus stop, so it just seems people

24   saw her on a regular basis.

25   Q   And when you were talking about this chores, you said

1  walking the dog, right?

2  A    Correct.

3  Q    Okay.  Mowing the lawn?

4  A    Uh-huh.

5  Q    Walking the kids to the bus stop?

6  A    Uh-huh.

7  Q    And those are pretty normal things that a lot of people do

8  every day, aren't they, Agent?

9  A    Yes, sir.

10  Q    Okay.  I'm going --

11      (Pause.)

12  Q    Did she ever tell you who her best friend was?  A guy named

13  Anthony?  Did she ever mention him to you?

14  A    Huh-uh.

15  Q    Did she ever --

16          THE COURT:  Is that a no?

17          THE WITNESS:  No, sir.  Sorry.

18          THE COURT:  Thank you.

19          THE WITNESS:  No.

20  BY MR. WYATT:

21  Q    Did she ever mention any friends that she had outside the

22  Toure home?

23          MS. BAILEY:  I'm going to object again to relevance,

24  Your Honor.

25          THE COURT:  Overruled.

```
 1  BY MR. WYATT:

 2  Q   Go ahead.

 3  A    In her mind, she didn't have like close girlfriends.  There

 4  wasn't this cadre of people that she hung out with.  She was

 5  exposed to -- we know that she went to like some youth group

 6  and got to meet with them.  But in terms of like there was no

 7  slumber parties.  She wasn't -- there was none of that.

 8  Q   Well, the youth group that I believe you're referencing is

 9  the Bahá'í Faith church group, correct?

10  A   Yes, sir.

11  Q   Okay.  And where did they meet?

12  A   I'd have to go back.  We've spoken to the lady who runs it,

13  and I -- I know they meet offsite.  I mean, it's -- like it's

14  somewhere local.

15  Q   Right.  And actually, she -- she walked to those meetings,

16  correct?

17  A   Yep.

18  Q   Okay.  And those meetings were held either once a week or

19  two times a week, correct?

20  A   I think that's -- I believe that's the frequency.

21  Q   Okay.  And during those meetings, we're not talking a

22  meeting with one person, one-on-one.  We're talking about 12 to

23  15 people that would meet in this Bahá'í Faith youth group,

24  correct?

25  A   Yes, sir.
```

 1   Q    Okay.  How many of those people have you reached out to and

 2   talked to them?

 3   A    We just talked to the like head organizer.

 4   Q    And the Toures are Muslim, correct?  Do you know that?  If

 5   you know, you answer it.  If you don't, --

 6   A    I do not know, sir.

 7   Q    Okay.  The Bahá'í Faith, have you learned that that is a

 8   sect of the Muslim faith?

 9   A    Yes, sir.

10   Q    Okay.  And -- well, I guess if you don't know that they

11   were Muslim, then you know that they're not Bahá'í Faith

12   Muslims.

13   A    Okay.

14   Q    Okay.  Well, did you know that?

15   A    I did not.  No, sir.

16   Q    Okay.  So she was --

17        MR. WYATT:  Let me just recap briefly, Your Honor.

18   BY MR. WYATT:

19   Q    She was allowed to leave the house to go running, correct?

20   A    Yes, sir.

21   Q    She was allowed to leave the house to go on vacations,

22   correct?

23   A    Yes, sir.

24   Q    She was allowed to leave the --

25        THE COURT:  I don't need it all recapped.

 1            MR. WYATT:  Oh, you don't need it all?  Okay.

 2            THE COURT:  I've been listening for a couple hours

 3  now.

 4            MR. WYATT:  Okay.

 5  BY MR. WYATT:

 6  Q   As an investigator for the State Department, do you have

 7  the power to put a person or to petition a group to put

 8  somebody on a no-fly list?

 9  A   I -- probably.

10  Q   Okay.

11            MR. WYATT:  No further questions, Your Honor.

12            THE COURT:  Anything further for this witness?

13            MS. BAILEY:  Just a handful of redirect questions,

14  Your Honor.

15            THE COURT:  Okay.

16                      REDIRECT EXAMINATION

17  BY MS. BAILEY:

18  Q   Agent, when you had a chance to -- your supervisor

19  interviewed Mr. Toure after his arrest last week, correct?

20  A   Yes.

21  Q   And when Mr. Toure was describing this arrangement for Jane

22  Doe to go back to Africa, what word did he specifically use to

23  describe her leaving the house?

24  A   That she escaped.

25  Q   He said she escaped?

1  A    She escaped.

2  Q    And when the agent repeated that to him in other questions,

3  did he ever object to that term?

4  A    No.

5  Q    You have been working trafficking cases for a long time,

6  correct?

7  A    For a few years, yes.

8  Q    When you have a case like this that involves a trafficker

9  and a victim over a long period of time, is it unusual for the

10  defendants to be nice on occasion to the victim?

11  A    It is not abnormal at all.

12  Q    In fact, in your training and experience, would you say

13  that that is part of the coercive scheme that underlies

14  trafficking, --

15  A    Yes.

16  Q    -- is to be nice?

17  A    Yes.

18  Q    Okay.

19        MS. BAILEY:  No further questions.

20        THE COURT:  All right.  Thank you.  You may step down.

21        MR. PALMER:  One question.

22        THE COURT:  Is it limited to the scope of those

23  questions?

24        MR. PALMER:  No.

25        THE COURT:  You may step down.

1          THE WITNESS:  Thank you, Your Honor.

2      (The witness steps down.)

3          THE COURT:  Any additional evidence from the

4  Government at this time on probable cause or detention?

5          MS. BAILEY:  No, sir.

6          THE COURT:  All right.  Mr. Palmer, do you wish to go

7  first, and do you have evidence to present on the issues of

8  probable cause and detention?

9          MR. PALMER:  On detention, Your Honor.  And I have the

10 exhibits marked now.

11         THE COURT:  Perfect.  Now, none of these have been

12 offered into evidence.  Is this just for purposes of this

13 hearing, from the Government, the 1 through 12 that were

14 presented?

15         MS. BAILEY:  Yes, Your Honor.  No objection.

16         THE COURT:  Okay.

17         MR. PALMER:  And we have no objection to their

18 documents.

19         THE COURT:  All right.

20         MR. PALMER:  And we would offer -- they're 1 through

21 40, but there may not be contiguous -- there may be a couple

22 that are --

23         THE COURT:  So I'm going are to admit all the exhibits

24 for purposes of the hearing.  They will be returned to the

25 parties for safekeeping after my clerk makes a note of it.

 1   That way, you can keep track of the numbers and the exhibits.

 2   You may approach.  All right.  So, --

 3       (Defendants' Exhibits 1 through 40 are received into

 4   evidence.  Government's Exhibits 1 through 12 are received into

 5   evidence.)

 6           THE COURT:  And they're marked on the back for

 7   purposes of the record?

 8           MR. PALMER:  Yes, Your Honor.

 9           THE COURT:  Defendants' 1 through 40.  All right.  You

10   may call your first witness.

11           MR. PALMER:  We're going to call Sarah Toure.

12           THE COURT:  And I know there are -- that's all right.

13   And I know there are a lot of people in the gallery.  If you

14   could have a representative witness or two, that would be

15   great.  I don't need to hear from 30 or 40.

16           MR. PALMER:  Oh, no.  Judge, we plan on calling about

17   five.

18           THE COURT:  How about three?

19           MR. PALMER:  Whatever pleases the Court.

20           THE COURT:  Well, unless you've got something new.

21   And, you know, I just don't want the repetitive.

22           MR. PALMER:  No.  All right.

23           THE COURT:  You may call your first witness.

24           MR. PALMER:  Ms. Perlstein will be conducting the

25   direct examination of Ms. --

```
 1              THE COURT:  All right.  And Ms. Sarah--?

 2              MS. TOURE:  Toure.

 3              THE COURT:  Last name?

 4              MS. TOURE:  Toure.

 5              THE COURT:  Toure?  All right.  Ms. Toure, please come

 6   forward.

 7        And tell me your name again for the --

 8              MS. PERLSTEIN:  Rebekah Perlstein.

 9              THE COURT:  Thank you.

10              THE CLERK:  Can you spell your last name, please?

11              MS. PERLSTEIN:  P-E-R-

12              MS. TOURE:  T-O-U-R-

13              THE COURT:  No.  I'm sorry.  Right here.

14              MS. TOURE:  Sorry.

15              MS. PERLSTEIN:  That's okay.  P-E-R-L-S-T-E-I-N.

16              THE COURT:  Thank you.  Now, Ms. Toure, if you would

17   please come forward.  I'm going to ask you to raise your right

18   hand and be sworn by my clerk.

19        (The witness is sworn.)

20              THE COURT:  Thank you.  You may come around here and

21   have a seat.  You seem nervous.  Take a deep breath.  We're all

22   going to be nice to you, I promise.  Just speak into that

23   microphone.

24              THE WITNESS:  Okay.

25              THE COURT:  And counsel, you may proceed.
```

 1          MS. PERLSTEIN:  Thank you, Your Honor.

 2              SARAH TOURE, DEFENDANTS' WITNESS, SWORN

 3                        DIRECT EXAMINATION

 4   BY MS. PERLSTEIN:

 5   Q    Sarah, how are you related to the individuals here in the

 6   courtroom?

 7   A    They're my parents.

 8   Q    And how many siblings do you have?

 9   A    I have four blood siblings.

10          MS. PERLSTEIN:  May I approach for one moment, --

11          THE COURT:  You may.

12          MS. PERLSTEIN:  -- just to clarify the issue that we

13   discussed in chambers.

14          THE COURT:  Okay.  Yes.

15      (Pause.)

16          THE WITNESS:  Okay.

17          MS. PERLSTEIN:  Thank you, Your Honor.

18          THE COURT:  Do you understand the instruction?

19          THE WITNESS:  Yes, sir.  Yes.

20   BY MS. PERLSTEIN:

21   Q    Okay.  You were just saying you have four blood siblings?

22   A    Yes.

23   Q    You can continue.

24   A    I have my oldest -- two other brothers, my younger brother,

25   and my younger sister.

1   Q    Okay.  And do you consider someone else a member of your

2   family?

3   A    I do.

4   Q    And that person that we're referring to, we've been calling

5   her Jane Doe.

6   A    Yeah.

7   Q    Do you recall when Jane Doe arrived?

8   A    I don't have a clear memory of when she arrived.  I was

9   very young.

10  Q    Okay.  About how young were you?

11  A    They're saying 2000, so I would be five years old.

12  Q    Okay.  And we've given some photographs to the Court.

13          MS. PERLSTEIN:  May I approach?

14          THE COURT:  You may.

15          MS. PERLSTEIN:  And may I be free to move about the

16  courtroom?

17          THE COURT:  You may.

18  BY MS. PERLSTEIN:

19  Q    Here I'm showing you this photograph.  And then

20  (inaudible).

21          MS. PERLSTEIN:  Your Honor, I apologize.  I don't know

22  what number this is marked as, but --

23          THE COURT:  That's 40.

24          MS. PERLSTEIN:  Thank you.

25  BY MS. PERLSTEIN:

1  Q   So, in Defense's 40, I just showed you a photograph.  What

2  is that photograph of?

3  A   It is of my family.  We are in the hospital.  My

4  grandfather on my mother's side was sick.

5  Q   And how old are you in that photo?

6  A   I believe that that photo was taken in 2001, so I would be

7  six.

8  Q   And is that really the earliest photograph that we've been

9  able to find in gleaning all of the photographs on your

10  siblings and your computer?

11  A   On my computer, yes, I believe so.

12  Q   And in that photograph, is Jane Doe present?

13  A   Yes.

14  Q   In the photograph, is -- which individual is she?

15  A   She is between my two oldest brothers.  She's the child

16  behind them, taller than both of them.

17  Q   So she is the female wearing the dark green shirt; --

18  A   Yes.

19  Q   -- is that correct?

20  A   Uh-huh.

21  Q   Which little girl are you?

22  A   I would be all the way on the right side, the smallest.

23  Q   And the other female in the picture, just to clarify for

24  the Court, that is not a sibling of yours?

25  A   Not a sibling, no.

1   Q   She's much older than you are, correct?

2   A   The Jane Doe?

3   Q   Yes.

4   A   Yes.

5   Q   And is it your understanding that when she arrived, one

6   year after the Government is saying she got here, would you

7   have thought she was five?

8   A   No, I would not think that.

9   Q   Okay.  About how old did you think she was?

10  A   I thought that she was like maybe 12, 13, 14.  Just

11  definitely above 10.

12  Q   Okay.

13  A   Yeah.

14  Q   When she arrived or when you have a memory of her arriving

15  and being a part of the family, what was your understanding of

16  who she was and what her role was?

17  A   She was my cousin.  I mean, her role, she was a family

18  member.

19  Q   Okay.  And growing up with Jane Doe, how did she fit into

20  your family?

21  A   She was our cousin.  She did everything -- she did

22  everything with us.  We would drive to, you know, different

23  cities within the U.S.  She would come with us.  I mean, just

24  like all the rest of us, she had a choice whether she wanted to

25  come with us or whether she wanted to stay.  Most of the time,

1    she would want to come with us, which makes sense if we're

2    going on a, you know, a family vacation, like why would she

3    want to stay?  I mean, she was like part of the siblings, like

4    we were just family.

5    Q    And you've heard the hearing today and you've seen the

6    complaint in this case, correct?

7    A    Yes.

8    Q    So I want to discuss briefly a couple of those things.

9    There has been discussion about chores.  Did you all have

10   chores in the house?

11   A    Yes.

12   Q    Can you describe for the Court the types of chores that you

13   all had?

14   A    Yes.  We would dust, vacuum.  I remember me specifically, I

15   really -- I don't want to say enjoyed, but like my -- what I

16   would want to do and what I would kind of like call is like

17   cleaning windows, and we had glass tables downstairs, and so I

18   liked using the spray bottle.  So I'd like spray and clean

19   those tables.  You know, cleaning the up -- my parents lived

20   downstairs, so we had an upstairs living room and we were

21   responsible for making sure that that was clean.

22   Q    Specifically, were you all in charge of your own beds?

23   A    Yes.

24   Q    Okay.  Did you all have to make your own beds?

25   A    Yes.

1  Q    Was Jane Doe responsible for cleaning up after all of you?

2  A    No.

3  Q    We talked about walking the dog.  Did you have a dog chart?

4  A    Yes.

5  Q    There was -- I have vivid memory of a calendar where my mom

6  wrote all of the children's names, and it just went kind of

7  like week by week.  And every day we had -- whoever's name was

8  on that day was responsible for walking the dogs that night.  I

9  have -- I do remember there was one night where it was my turn,

10 I didn't want to walk the dog because my friend had come over

11 and I didn't want to like have to go walk the dog like with my

12 friend, so the dog pooped in the house.  And because it was my

13 responsibility to walk the dog, I was the one that had to clean

14 it up.

15 Q    Okay.  And just going back for a moment, we talked about

16 making the beds.  Did Jane Doe have a bed?

17 A    She had a bed in Rima's room.

18 Q    And did you all share rooms at some point --

19 A    Yes.

20 Q    -- for a while?

21 A    Yes.

22 Q    Aside from Jane Doe, you had, you know, there were five

23 kids to your mom and your dad, correct?

24 A    Yes.

25 Q    Did you share bathrooms?

1  A    Yes.  We shared bathrooms.

2  Q    Um,  --

3  A    No one had their own bathroom except for my parents.

4  Q    So you had what's called a Jack-and-Jill bathroom; is that

5  correct?

6  A    I'm not familiar with that term.  I'm sorry.

7  Q    That go between rooms.

8  A    Yeah.  Oh, yeah, yeah.  There was bathrooms between like

9  separating the rooms, yeah.

10  Q    And girls had a bathroom and boys had a bathroom?

11  A    Uh-huh.  And even like -- like earlier, like I had to share

12  a bathroom with my brothers as well.  So I had my ways of

13  sharing a bathroom with my brother, and then as time went on,

14  yeah, the girls had a bathroom and the boys had a bathroom.

15  Q    Was it uncommon to have hand-me-down clothes between all of

16  your siblings?

17  A    No.

18  Q    Do you have videos of you sharing your clothes with Jane

19  Doe --

20  A    Yes.

21  Q    -- where you're mentioning these clothes were hand-me-downs

22  from your mom?

23  A    Yes.

24  Q    That's not uncommon with many siblings in a home?

25  A    No, it's not uncommon.

1   Q   Do you have independent recollections of having outings

2   with Jane Doe?

3   A   Yes.

4   Q   Okay.  What are some of the things that you would do?

5   A   We shopped a lot.  I have memories of -- there's a time --

6   and we also have like a photo evidence of this -- it was me,

7   Rima, and Jane, I don't know, am I allowed say the name?

8   Q   You can say your siblings' names.

9   A   Okay, okay.  Yeah, me, Rima, and Jane Doe went out just us

10  to have breakfast.  Also, I have memory of there was a Black

11  Friday where we decided for some reason that we were going to

12  like take part in the whole Black Friday everything.  So we

13  left the house around maybe midnight, hit up two to three

14  malls.  It was me, Jane Doe, and two others.

15  Q   There's been talk about abuse in the home, and I want to

16  talk about that.  Is this something that you know to be true?

17  A   No.

18  Q   Okay.  How were you and your siblings disciplined?

19  A   We were spanked.  Sometimes with a belt.  We had time-outs.

20  And, you know, sometimes like less serious they would, you

21  know, kind of like take our ear maybe.  Not in any kind of

22  forceful, terribly turned way.  Just kind of like a normal --

23  Q   And --

24  A   Normal discipline.

25  Q   And you're facing away from the judge, but you just

1  described a twist of your ear, not a pull of your ear; is that

2  correct?

3  A    Exactly.

4  Q    Was that across the board, --

5  A    Yes.

6  Q    -- males and females?

7  A    Yes.

8  Q    Did that also apply to Jane Doe?

9  A    Yes.

10  Q    Was she punished worse than any of you?

11  A    No.

12  Q    And speaking with all of your siblings, is it true that

13  some of your siblings tried to get out of their punishment?

14  A    Absolutely.

15  Q    Did they get punished any worse for trying to avoid

16  punishment?

17  A    No.

18  Q    Okay.

19  A    No.

20  Q    Was it a -- we're springing punishment on you, or this is

21  why you're being punished, because you have not done what you

22  need to do?

23  A    It was very clear why we were getting punished.  The

24  siblings that you're referring to that would run away, it was

25  because they knew what they did and they knew that they were

1   going to get in trouble for it, so --

2   Q    And I'm not referring to Jane Doe.  I'm referring to some

3   of your male siblings.

4   A    Exactly.  Yes.

5   Q    The complaint and in this hearing we've talked about Jane

6   Doe running away or being so-called banished.  Is running away

7   or her going to the park something you have a recollection of?

8   A    Yes.

9   Q    Okay.  Why do you recall that would happen?

10  A    She could sometimes get in an argument with -- I -- one of

11  my parents or my parents.  And she would just walk out and go

12  to the park.  I have memories of myself doing that when I would

13  get upset with my parents.  And I can't speak to my siblings,

14  but I'm sure that there have been occasions where they have

15  also gotten upset, and we lived right by a park, so you could

16  take a walk, cool down, you know, just, yeah, go to the park.

17  I have memories of Jane Doe doing that as well as myself.

18  Q    Was that something that you knew in your house to be an

19  issue, where she's run away or she's escaped, or this was just,

20  she's walked out again?

21  A    She's walked out.  It was more of a she walked -- she's

22  walked out again.  We have like -- on several occasions, if she

23  walks out and she doesn't come back within, you know, a

24  reasonable amount of time, I have gone in the car with my

25  parents, going to the park, trying to see like -- just make

1   sure she was okay, like any parent would do for a child.

2   Q   You -- we talked about a Father's Day incident where there

3   was a fight and Jane Doe says she ended up jumping out of a

4   window.  What did your family do on special occasions?

5   A   We would go out to eat a lot of the times, most of the

6   time, or order food to come to the house.

7   Q   On Father's Day of 2016, what did you do for Father's Day?

8   A   We went to B.J.'s.

9   Q   And in fact, did you bring some souvenir glasses to our

10  office from that day?

11  A   Yes.  We went and they had Father's Day 2016 cups that they

12  handed out.  They gave it to my dad, obviously, and, you know,

13  the server was kind of making jokes with my brothers, saying,

14  well, you'll be fathers one day as well, so they gave them cups

15  as well.

16  Q   And was there a fight that took place on Father's Day that

17  you recall?

18  A   Yes.

19  Q   Was it between Jane Doe and your parents or someone else?

20  A   It was between someone else.

21  Q   One of your other siblings?

22  A   Yes.  My oldest brother.

23  Q   A physical fight or a verbal fight?

24  A   Verbal fight.  We were in the restaurant.

25  Q   Okay.

1  A    It was a little embarrassing.

2  Q    Okay.  And that's because he ordered a beer, not because --

3  A    Exactly.  He ordered a beer in front of my dad, and my

4  parents are Muslim, so that's not something, you know, that --

5  Muslims don't drink.  So my father was upset by that because

6  although, you know, Ahmed is grown, we were all sitting, and he

7  believed that he should respect his faith by not buying a beer

8  in front of him and drinking it in front of him.

9  Q    In terms of celebrating birthdays, do you have an

10  independent recollection of why Jane Doe said she didn't want

11  to celebrate her birthday?

12  A    Yes.  She has, on several occasions, showed me her

13  passport.  She told me that is not her birthday.  She doesn't

14  know when her birthday is.  And so -- because I've asked her

15  about it in the past.  She said, that's not my birthday.

16  Q    So you say she's shown you her passport.  Did she have

17  access to her passport?

18  A    She definitely had access to her passport.  On multiple

19  occasions, I have recollections of her showing me her passport.

20  Q    There's been an allegation or you heard the State's agent

21  say that the Toure children referred to Jane Doe as a slave.

22  A    Never.

23  Q    Okay.  You said never.  You have never referred to her as a

24  slave?

25  A    (no audible response)

1  Q    When you heard about this allegation, --

2  A    I'm sorry.

3  Q    -- what was your reaction?

4  A    I mean, I was shocked.  I mean, with this whole entire

5  situation, I'm in shock.  I don't understand how this could

6  happen.

7  Q    The picture that has been painted or rather the puzzle

8  pieces that the agent says that they have, do you think it is

9  an accurate picture of what took place in your home for 16

10 years?

11 A    No.

12 Q    And since we are cutting down our witnesses, do you feel

13 like that is the collective agreement that all four of your

14 other siblings would also agree to?

15 A    That they would agree that that's -- the picture they are

16 painting is not accurate?

17 Q    Correct.

18 A    Yes.

19 Q    Do you feel like you and your siblings, who grew up in a

20 home with Jane Doe, would be the best witnesses to give an

21 accurate portrayal of what took place in this home?

22 A    Yes.

23 Q    And in fact, when this happened -- you heard them say that

24 all five of you are scattered -- all five of you came together,

25 correct?

1   A    Yes.

2   Q    All five of you have scoured to find pictures, videos,

3   documentation that you can say, look, this is not true.

4   Correct?

5   A    Yes.  And I'm proud of my family.

6   Q    I'm sorry?

7   A    I am proud of my family for that.  We really did.

8           THE COURT:  I'm --

9           THE WITNESS:  We came together.

10          THE COURT:  I'm sorry.  I can't understand you.  Take

11   your time.

12          THE WITNESS:  Sorry.

13          THE COURT:  Go ahead.  Just speak nice and clearly for

14   me.

15          THE WITNESS:  I said yes, and I am so proud of my

16   family for everything we've been able to accomplish in the past

17   few days.  In the past few days.  I'm sorry.

18          THE COURT:  That's okay.

19   BY MS. PERLSTEIN:

20   Q    You've spent the weekend taking apart all of these

21   statements to try to put together what you believe to be an

22   accurate picture of what took place in your home?

23   A    Definitely.  My -- mine was personally 12 pages, and that

24   was just mine.

25   Q    Okay.  Each one of your siblings has written rebuttals for

```
 1  us, correct?

 2  A    Yes.

 3  Q    You've scoured laptops, correct?

 4  A    Yes.

 5  Q    And just the 40 exhibits that Defense has put together and

 6  submitted to the Court is a fraction of what we've been able to

 7  compile, correct?

 8  A    Correct.

 9  Q    Sarah, if your parents were admonished not to leave the

10  United States, would they stay?

11  A    They would never leave us.

12           THE COURT:  I'm sorry.

13           MS. PERLSTEIN:  That's okay.

14  BY MS. PERLSTEIN:

15  Q    Sarah, just take a moment.  Regain your composure.

16  A    I'm so sorry.

17           THE COURT:  You're okay.

18           THE WITNESS:  They would never leave us here.

19  BY MS. PERLSTEIN:

20  Q    Your parents, do you believe that they would stay and face

21  the charges that have been alleged?

22  A    Yes.

23  Q    Why do you believe that?

24  A    My parents love us more than anything.  They have never

25  done anything wrong.  They would never just -- they wouldn't.
```

1    In regards to let's just even take us siblings out of it.

2 They would never try to get themselves out of this situation.

3 They've done nothing wrong.  They have nothing to hide.  They

4 have nothing to run from.  They are not going to run.  And then

5 in just regards to my siblings, like I said, we are their whole

6 life and they would never leave us in this situation.

7 Q   Do you believe that they would abide by all the rules that

8 this Court sets?

9 A   Yes.

10 Q   All five of the siblings, including yourself, are U.S.

11 citizens, correct?

12 A   Yes.

13 Q   Are you or any of your siblings planning on moving to

14 Guinea?

15 A   No.

16 Q   Okay.  No current plans and no future plans?

17 A   No.

18 Q   Do you --

19 A   I just got a job a couple months ago in Austin.

20 Q   Okay.

21 A   I just started two months ago.

22 Q   In fact, all of your siblings who are of the age to either

23 be in school or work are either in college or have jobs and are

24 solidified in the United States, correct?

25 A   Yes.  All of my adult siblings, yes.

1  Q   And your youngest sibling, who is 15, is currently enrolled

2  in school, correct?

3  A   Yes.  She is.

4  Q   Do you believe your father to be a good man?

5  A   Do I believe my father to be a good man?  Of course.

6  Q   Okay.  Speak up just a bit.

7  A   I'm so sorry.

8           THE COURT:  There you go.

9           THE WITNESS:  Of course.

10  BY MS. PERLSTEIN:

11  Q   And do you believe your mother to be a good woman?

12  A   Of course.

13  Q   We have a completely packed courtroom.

14  A   Thank you guys so much.  I'm sorry.  Thank you, everyone.

15  Q   Do you believe that this is evidence that they have ties to

16  the community?

17  A   Absolutely.  I'm just -- I'm sorry.

18           THE COURT:  Take a moment and compose yourself,

19  because --

20           THE WITNESS:  I'm sorry.  Yeah.  Yes, I'm sorry.

21           THE COURT:  -- I can't understand you.  So, take your

22  time.

23           THE WITNESS:  Just --

24  BY MS. PERLSTEIN:

25  Q   There's tissues right behind you.

1   A    Thank you.  Thank you.  Just to see how many people came to

2   support us, it's just -- it melts my heart.  I just want -- we

3   have so many people here willing to help us, to support us,

4   just to just be here, standing for I don't know how many hours

5   we've been here now.  Just goes to show, I mean, my parents are

6   good people.

7   Q    And --

8   A    They're not going to -- they're not going to --

9   Q    And let me interrupt you real fast.

10  A    Sorry.

11  Q    These people behind us, we have all five of your siblings

12  here, correct?

13  A    Yes.  Yes.  Correct.

14  Q    We have neighbors from Southlake, correct?

15  A    Yes.  Correct.

16  Q    We have people who have flown in today, correct?

17  A    Correct.

18  Q    Where have they flown in from?

19  A    We have from Philadelphia.  We have some family that drove

20  from Houston.  And we have knowledge that we have some family

21  members that were unable to come today but are currently making

22  plans to come visit us.

23  Q    Okay.  There are multiple members of your siblings' friends

24  and family, correct, --

25  A    Correct.

1   Q    -- who have grown up with you and your siblings, who know

2   your parents well?

3   A    Yes.  Correct.

4   Q    Okay.  When we reached out, we had an outpouring of people

5   who said yes, I would be willing to testify, correct?

6   A    Correct.

7   Q    To your knowledge and based on the work that we did over

8   the weekend, were the majority if not all of these people, they

9   were not questioned by the State, correct?

10  A    No, not to my knowledge.

11  Q    And the first time that you were questioned was on

12  Wednesday?

13  A    On Wednesday.

14  Q    And the --

15  A    They told me -- they didn't even tell me what was going on.

16  They told me that (inaudible) had gone missing, so -- and if I

17  would cooperate to help them find her.

18  Q    Just remember to use --

19  A    Oh, I'm so sorry.  I'm sorry.

20  Q    That's okay.

21        THE COURT:  Jane Doe.

22        THE WITNESS:  I'm sorry.  Jane Doe.  And I said of

23  course.  I will do anything that I can to help you find her.

24  BY MS. PERLSTEIN:

25  Q    Okay.  And so your impression was it was a missing persons

 1   case?

 2   A    Exactly.

 3   Q    And under that impression, you said absolutely, let me help

 4   you, I will cooperate and do anything I can to help?

 5   A    Correct.

 6              MS. PERLSTEIN:  I'll pass the witness.

 7              THE COURT:  Cross-examination?

 8              MR. NOLAN:  Just briefly, Your Honor.

 9                    CROSS-EXAMINATION

10   Q    Ms. Toure, I -- first, I understand, I know this is

11   difficult, your parents there.

12   A    Thank you.

13   Q    So we'll go through this quick.  How old are you?

14   A    I'm 23.

15   Q    And where did you go to college?

16   A    I spent my first year at UT Arlington, and then I graduated

17   from UT Austin.

18   Q    Okay.  So you graduated UT Austin?

19   A    Yes.

20   Q    You just started working in Austin?

21   A    Yes.  Two months ago.

22   Q    And what do you do?

23   A    I'm a sales development representative for a tech startup,

24   Accumedics.

25   Q    Okay.  And where did you go to high school?

1  A   Carroll.

2  Q   Okay.  And you said that you were five when Jane Doe came

3  to the United States?

4  A   Based off of the information that I've been given, I would

5  be five, yes.

6  Q   Okay.  And you thought that she was maybe seven or so years

7  older than you?

8  A   Yes.  I mean, I'm not going to say exactly seven.  I'm not

9  exactly sure.  But she was definitely significantly older than

10  me.

11  Q   In that range, --

12  A   Yes.

13  Q   -- that she was probably early --

14  A   Over 10.

15  Q   -- early teens, over 10?

16  A   Yes.

17  Q   Okay.

18  A   Early teens, yes.

19  Q   Okay.  Something in that area?

20  A   Something like that.

21  Q   What would -- would she do things with you in terms of you

22  were younger than her at that point.  Would she do things like

23  babysit you in that way?  Would she watch you if the parents

24  were not around?

25  A   Normally, with my siblings, my oldest siblings would -- if

1   my parents would leave, my oldest siblings were in charge of

2   like making sure that, I mean, the younger ones didn't get hurt

3   or in trouble.  Was it exclusively her job to watch me?

4   Absolutely not.

5   Q    No.  But she would do that, right?

6   A    I mean, yeah, along with my other older siblings.

7   Q    Okay.  And it would be unusual, don't you think, if your

8   parents put a five-year-old necessarily to watch another five-

9   year-old?  You would think that would be a bit strange, right?

10  A    I would say that would be strange.

11  Q    So odds are she probably was a little bit older than five

12  when she actually came here?

13  A    I think there's significant evidence to say that she was

14  definitely not five.

15  Q    Yeah.  That makes sense.  All right.  Where is -- where is

16  she from, to the best of your knowledge?

17  A    Guinea.

18  Q    Okay.  And what part exactly?

19  A    I'm not exactly sure.  I thought that maybe from Conakry.

20  That's just because that's where a lot of my family lived.  But

21  I wasn't sure exactly like -- like I said, maybe Conakry, --

22  Q    Have you --

23  A    -- because that's where my family is from.

24  Q    Have you ever asked her about these things?

25  A    I mean, we'd normally just say Guinea.

1  Q   Not normally.  What did you -- did you ever ask her or talk

2  with her about like where she was from?

3  A   We knew she was from Guinea.  She said she was from Guinea.

4  Yes.

5  Q   I'm sorry.  I'm not trying to -- I just want you to answer

6  the question that I'm asking --

7  A   Am I -- I'm sorry.  I --

8  Q   -- so we can get the thing.

9        THE COURT:  Hold on.  Don't talk over each other.  Let

10  him finish the question.

11  BY MR. NOLAN:

12  Q   So, have you ever had conversations with her about where

13  she's from?

14  A   To my knowledge, yes.  Like I said, from Guinea.

15  Q   Okay.

16  A   Specifically, no.

17  Q   Okay.  So you've never had conversations with her about

18  specifically what she remembers from back home, things like

19  that, where she's from?

20  A   She would talk about a younger sister who she had contact

21  with.

22  Q   What's that sister's name?

23  A   I do not know.

24  Q   That's your cousin, right?

25  A   So, something that needs to be understood.  In Guinea, it

1   is culture to refer to close family friends and just everyone

2   around you as cousins, aunts, uncles.  If there is no blood

3   relation, we will call someone, our elders, auntie, --

4   Q    Okay.

5   A    -- uncle.  People our age, cousins.

6   Q    That's --

7   A    I just want to make that clear.

8   Q    That's really helpful.  So is Jane Doe an actual cousin or

9   somebody you just call cousin?

10  A    I'm -- I'm not sure whether she's an actual cousin or

11  someone we called a cousin.  If you asked me about more than

12  half of my family, I would tell you the same thing.

13  Q    Okay.  And what about her sister?

14  A    My -- her sister -- Jane Doe's --

15  Q    Her sister, Jane Doe's sister.

16  A    -- sister?

17  Q    Yeah.

18  A    What about her?

19  Q    What do you know about her?

20  A    I just know that she was her sister.

21  Q    Okay.  Did you ever talk to her about her sister or what

22  she remembers about her sister, things like that?

23  A    There were -- there was a -- I mean, she would have phone

24  conversations.  And I wasn't on the phone with her, but to my

25  -- the best of my knowledge, it was her -- her family, her

1  sister, her father.

2  Q   Did you ever witness these phone conversations, --

3  A   Yes.

4  Q   -- actually hear them?

5  A   Yes.

6  Q   Okay.

7  A   Oh, actually hear what's going on on the phone?

8  Q   Yeah.

9  A   No.

10 Q   Maybe not both ends, but, you know, at least one side of

11 the conversation?

12 A   Yes.  Every time someone from her family would call, my

13 parents would give her the phone.  Like I have recollection of

14 her being reluctant to take the phone call, just kind of like

15 rolling her eyes, like why are they calling me type behavior.

16 Q   Okay.  Who's they?  Who's they?

17 A   Her family.

18 Q   Yeah.  Like who exactly?  Who would call?

19 A   Father, sister -- this is all to the best of my knowledge

20 -- father, sister.  I'm not sure about her mother, but maybe

21 her mother as well.

22 Q   What's her father's name?

23 A   I don't know.

24 Q   Is that your uncle?  You don't know his name?

25 A   Like I said, I have no --

1  Q    Whether he's real or not, --

2  A    Exactly.

3  Q    -- you just -- you just don't know his name?

4  A    Exactly.

5  Q    Okay.  All right.  So then I'm guessing, but you tell me

6  for purposes of this, that you do not have any knowledge of the

7  arrangement that was made between Jane Doe's father and your

8  parents about how she was going to come over?

9  A    I -- from when she came, like are you asking me, at five

10 years old, was I aware of why -- what --

11          THE COURT:  Or are you aware --

12 BY MR. NOLAN:

13 Q    At five or at any --

14          THE COURT:  Or are you aware now?

15          MR. NOLAN:  Yeah.

16          THE WITNESS:  From like the past few days, what I've

17 heard, like been talking with my family, like yes, I have some

18 sort of understanding.

19 BY MR. NOLAN:

20 Q    Okay.  Let's make the cutoff point at the day of your

21 parents' arrest.  Let's talk about things just prior to that.

22 Did you know prior to that what the arrangement was between

23 Jane Doe's father and your parents about why she was coming

24 over?

25 A    The only thing that I knew was that she was -- my parents

1   were taking care of her, took her into the house.

2       I mean, I don't know if you guys have ever been to Guinea,

3   but, I mean, it's a developing country.  There is a lot of

4   problems, you know, with just, I mean, like an example, trash

5   pickup is nonexistent.  So, for her to be able to come to live

6   in the United States in a house with electricity, water, all

7   the resources that we, I mean, that we have here, I would say

8   that that is my parents helping and taking care of her.

9   Q    Yeah.  Sure.  Have you been to Guinea?

10  A    I have.  I was there just this past December.

11  Q    Okay.  And did you go --

12  A    And that --

13  Q    -- see the area where Jane Doe is from?

14  A    I -- I -- like I said, I don't know exactly where she's

15  from so I can't say whether I was there or not.

16  Q    Okay.

17  A    I stayed mostly in Conakry with my grand -- we stayed at my

18  grandmother's house.  And there was one occasion where we drove

19  maybe an hour and a half inland and just stayed by like a creek

20  and they had a -- like a little restaurant-hotel type thing.  I

21  cannot tell you whether or not that was where --

22  Q    Okay.

23  A    -- Jane Doe was from.  Like I said, I don't know.

24  Q    Okay.  And a moment ago you thought when she came over she

25  was probably in the age range of 10 to 13, somewhere in that

1   area, or just --

2   A   Above 10.

3   Q   Or above -- at least above 10?

4   A   Yes.  At least.

5   Q   Early teens area.  When you were around that age, where did

6   you go to school?

7   A   At five?  I mean, I -- at five, I guess I would have been

8   at Clariden.

9   Q   Okay.

10  A   It's a preschool/kindergarten.

11  Q   Okay.  What was your understanding of why Jane Doe did not

12  go to school?

13  A   I was five.

14  Q   No, okay, well, at any point in your time there up until

15  the parents' arrest, what was your understanding of why Jane

16  Doe didn't go to school?

17  A   Up until the point of my arrest, their -- my understanding

18  was that there wasn't the proper paperwork to enroll her in

19  school.

20  Q   Did you find that strange, that in her entire life, you

21  know, for the most part being there, they never got paperwork

22  to send her to school?

23  A   I -- and honestly, I like just from Wednesday on, it feels

24  like a million years, so my memories from then and like from

25  before might overlap a little bit.

 1              THE COURT:  Well, the point he's making is, growing up

 2   in the house, --

 3              THE WITNESS:  Uh-huh.

 4              THE COURT:  -- did it ever strike you as odd that she

 5   never went to school?

 6              THE WITNESS:  I mean, I've spoken with her a lot.

 7   Like I said, I didn't think they had the proper paperwork, so

 8   given those circumstances, no.

 9              THE COURT:  Did you ever ask your parents, why doesn't

10   Jane Doe go to school?

11              THE WITNESS:  I don't have any memories of from a

12   young age asking.  As I got, you know, as I got older, I do

13   have some memories of my mom saying that her father would not

14   give the proper paperwork to enroll her in school.

15       My mother even approached me at one point, asking me to

16   help her with her reading, writing.  She asked me if -- and

17   this was also, I mean, a meeting that we had.  She -- my mother

18   didn't want her to feel embarrassed or anything by it, and she

19   asked me just, you know, if you can go and just try to

20   encourage her, help her in any way, then please do that.

21   That's something my mother asked me.

22       So, in regards to my parents taking away learning

23   materials, scolding her if she wanted to learn, that's

24   absolutely not the case.

25   BY MR. NOLAN:

1  Q   Are you aware of her legal status?

2  A   Exactly?  No.

3  Q   Okay.  Did your parents ever tell you that she was not in

4  the country legally?

5  A   I don't know if I ever -- I don't know if whether or not my

6  parents specifically told me that or not.  I don't.

7  Q   What did you suspect?

8  A   I did suspect that maybe -- that maybe she wasn't here -- I

9  mean, I don't know, like -- I don't know.

10 Q   Why did you suspect that?

11 A   Because we didn't have, like I said, proper paperwork.

12 Q   What do you mean by paperwork?

13 A   As far as I know, the only thing I saw was a passport.  So

14 I know that my parents had green cards.  I've seen them.  So,

15 from what I know, (inaudible) had a passport.

16        THE COURT:  Is this the passport you saw, Exhibit 1

17 the Government put in?

18        THE WITNESS:  There's a good chance yes.  There's a

19 good chance that -- yeah.

20        THE COURT:  Is that the one she showed you a few

21 times?

22        THE WITNESS:  Uh-huh.

23        THE COURT:  You talked about?

24        THE WITNESS:  Yes.

25        THE COURT:  And that's that picture of a really young-

 1  looking girl, --

 2            THE WITNESS:  Uh-huh.

 3            THE COURT:  -- correct?

 4            THE WITNESS:  Yeah.

 5            THE COURT:  And does that look like her at some point,

 6  whether it was accurate as of the date of the --

 7            THE WITNESS:  Can I take a good look at it?

 8            THE COURT:  Sure.  Of the issuance of the passport.

 9  Is that Jane Doe?

10            THE WITNESS:  I cannot confirm that that is her.

11  There are similarities, like I said.  I don't know if I also

12  said this.  She did say this is not her birthday.  She

13  suspected that this could be her sister.

14            THE COURT:  Okay.  Thank you.

15  BY MR. NOLAN:

16  Q   So, you suspected that she might not be here -- she might

17  not have documentation to be here legally; is that correct?

18  A   Correct.

19  Q   Okay.  All right.  I'm going to move on just for a bit, for

20  time purposes.  How did you describe Jane Doe to your friends,

21  --

22  A   Cousin.

23  Q   -- in the neighborhood, school, things like that?

24  A   She was our cousin.

25  Q   She was your cousin?

1  A    Yes.

2  Q    Did your friends ever ask like why doesn't she go to

3  school?

4  A    No.

5  Q    Did your friends ever make comments about her, you know,

6  being different from the family in some way?

7  A    No.  The only thing that my friends ever asked is maybe why

8  our cousin was staying with us.  And that was it.

9  Q    And what would you say?

10  A    I would say that my parents are taking care of her.

11  Q    Okay.  Did you ever have disagreements with Jane Doe?

12  A    Yes.  We all did.

13  Q    Did you ever have --

14  A    I mean, I had disagreements with all my siblings.

15  Q    Sure.

16  A    We're siblings.

17  Q    And sometimes you would have fights or arguments, things

18  like that?

19  A    Yes.

20  Q    Do you ever recall telling her that, quote, my mom doesn't

21  like you, you're only here to work?

22  A    No.

23  Q    You've never said that?

24  A    I have no memory of ever saying that.

25  Q    That's not what I asked.  I asked, did you -- did you say

1  it or did you not say it?

2  A   I say that -- I am telling you that I have no memory of

3  that.

4  Q   Okay.  So you might have said it?  You just don't remember?

5  A   I have a hard time believing I would ever say that.

6  Q   But you're still not giving me a firm denial.

7  A   I'm not exactly sure --

8  Q   Did you say that?

9  A   -- how to --

10        THE COURT:  There is a difference between not

11 recalling saying something and saying, I never said that.  Can

12 you say which it is for you?

13        THE WITNESS:  I can say that I don't recall ever

14 saying that.

15        THE COURT:  Okay.

16 BY MR. NOLAN:

17 Q   Fair enough.  Any of your friends in school or the

18 Southlake area, neighbors, things like that, do they have

19 nannies or housekeepers that are live-in housekeepers?

20 A   I'm not sure exactly of what was going on in their

21 households in regards to nannies and housekeepers.  I can't

22 attest to what my friends' families are doing.

23 Q   So you've never -- you've never known any friends to have a

24 nanny or a housekeeper?

25 A   I -- I don't -- I don't know.  I didn't live in their

 1  house, so I'm -- I mean, I'm trying to think of someone, but I

 2  don't know.

 3  Q   Okay.  When you went to school during the day, what time

 4  did you usually head to -- back when you were living in the

 5  house, growing up, either elementary school or high school,

 6  what time of the day would you usually get up to go to school?

 7  A   Time of -- the time that school started changed --

 8  Q   Yeah.

 9  A   -- with age.  So, --

10  Q   Roughly.

11  A   Maybe 7:30 maybe.

12  Q   Okay.  So you were out of the house most days, safe to say,

13  by 7:30?

14  A   Out of the house?  I don't know.  Maybe I'd wake -- like I

15  said, I've also been out of grade school for a number of years,

16  so my memory of when school started and when I woke up is not

17  like --

18  Q   Understandable.  I don't need an exact time.  I'm just

19  saying usually in the morning about what time would you be out

20  of the house growing up?

21  A   I don't know what time school started so --

22  Q   Okay.

23  A   It would take me maybe, depending on which school, like

24  there were some times when I walked to school.  I took the bus

25  sometimes.  It depended on what time the bus came.

1  Q    Sure.  Understandable.  Safe to say you were out of the

2  house by 9:00 a.m. most mornings?

3  A    I think that, yes, school would start before 9:00, I would

4  -- I would guess.  I don't -- like I said, I don't remember

5  exactly the time school started, so --

6  Q    Okay.  And that was from, you know, first grade all the way

7  up to high school?

8          THE COURT:  Where are we going?  Go ahead and get to

9  the point.

10 BY MR. NOLAN:

11 Q    Is it safe to say that you were out of the house most days

12 from 9:00 'til at least when school ended, probably after

13 after-school activities ended, from -- for most of your

14 childhood, correct?

15 A    I was in school, so yes.

16 Q    Okay.  And so Jane Doe was not in school, though, and she

17 would have been home with your mom and/or dad during those

18 periods of time.  Yes?

19 A    Yes, but there -- sometimes she could have been home alone.

20 Q    Okay.  Did you talk to Jane Doe about how she got that scar

21 on her ear?

22 A    I don't have memory of talking with her directly about it,

23 but my understanding is that her ear got caught.

24 Q    How do -- how has that understanding come to you?  Who told

25 you that?

1  A   I mean, like I said, I don't have like a direct memory of

2  sitting down with Jane Doe speaking about like the ear, but I

3  do just, I mean, it's -- it was in my head that, oh, her

4  earring got caught.  So, I mean, --

5  Q   Okay.

6  A   -- we could have had a conversation that maybe I don't

7  recall, but I do -- yeah.  And, I mean, especially in the

8  2000s, hoops were in.

9  Q   So it could have happened, --

10 A   I mean, it's easily --

11 Q   -- is what you're saying?

12 A   Yeah.  They would easily --

13 Q   All right.

14 A   -- get caught.

15 Q   What about the scars on her arms?  Did you ever talk to her

16 about the scars on her arms?

17 A   She was very active.  Climbing trees.  Doing --

18 Q   That's not what I asked.

19 A   Did I ever talk to her --

20 Q   Yes.  Thank you.

21 A   -- about the scars on her arms?

22 Q   Thank you.

23 A   No.

24 Q   No?  So you never had those conversations?

25 A   Not to my knowledge, not -- or not, not to my knowledge --

1  not to my memory.

2  Q    Okay.  Were you still living in the house when you were 16,

3  correct?

4  A    Yes.

5  Q    Okay.  You moved out to go to college at what, 18, I'm

6  guessing?

7  A    19.  I spent a year at UTA.  I stayed at home.

8  Q    Okay.  Did you have a conversation -- since this arrest,

9  you've probably, I'm guessing, have talked to all of your

10 siblings at some point?

11 A    Yes.

12 Q    Okay.  Did you talk to your oldest brother?

13 A    Yes.

14 Q    Did you discuss with him about when -- at what age you all

15 started to realize something was weird about -- about Jane Doe?

16 A    I don't think I would say that something was weird.  What

17 do you mean by something was weird?

18 Q    Well, if your brother said that he was 16 when it dawned on

19 him that there was something strange about this arrangement of

20 Jane Doe being there.

21 A    Can you please clarify what something strange means?

22 Q    Well, you tell me.  I'm asking if you had that conversation

23 with your brother.

24 A    No.

25 Q    Okay.  So you tell me then what did you -- did it ever

 1  occur to you at some point that Jane Doe is not like the rest

 2  of my siblings and this situation is not a situation that any

 3  of my friends or neighbors are also dealing with?  Like there's

 4  this person who lives in our house who doesn't go to school,

 5  who works -- who does chores around the house, who does things

 6  like that, but she doesn't go to school, she doesn't learn to

 7  read or write, things like that?

 8  A    She had access to learning to read and write.

 9  Q    You're not answering the question.

10  A    Sorry.  Can you ask the question again?

11  Q    My -- my -- I'm sorry.

12  A    I'm sorry.

13  Q    My question --

14  A    It's just when you say something --

15           THE COURT:  Hold on.

16           MR. NOLAN:  My --

17           THE WITNESS:  Sorry.

18           THE COURT:  First of all, voices are raising.  That

19  doesn't need to happen.

20           THE WITNESS:  I'm sorry.

21           THE COURT:  Just focus on his question.

22           THE WITNESS:  Okay.  I'm sorry.  Will you please

23  repeat the question?

24           THE COURT:  And try to answer it to the best of your

25  ability.

1   BY MR. NOLAN:

2   Q   My question was simply, did there ever come a time where

3   you thought this situation was, for lack of a better term, odd?

4   A   Like I said, I don't know what you mean by strange or odd

5   situation.  In regards to whether she was, quote, like the rest

6   of the siblings, in every way except for potentially like the

7   citizenship.  We knew she wasn't an American citizen.  So that

8   would be the only -- that would be the only difference that I

9   would say between like me and her.

10  Q   That's the only difference?

11  A   That's the only difference that I would say, yeah.

12          THE COURT:  Did she ever not have a bed?

13          THE WITNESS:  There were times where she would sleep

14  on the couch.  She watched a lot of TV.  I did have discussions

15  with her sometimes when she was younger --

16          THE COURT:  But my question was, --

17          THE WITNESS:  Oh, sorry.

18          THE COURT:  -- did she have a bed that was hers?

19          THE WITNESS:  She always had access to a bed.  We had

20  beds in the house that she was never -- it was never not

21  allowed that she would be able to sleep on a bed.

22          THE COURT:  Okay.  You had your own bed?

23          THE WITNESS:  Yes.

24          THE COURT:  Did each sibling have their own bed?

25          THE WITNESS:  We had beds, yes, that we slept in,

 1  yeah.

 2           THE COURT:  My question is different.

 3           THE WITNESS:  Yeah.

 4           THE COURT:  Did each of you have your own bed?

 5           THE WITNESS:  Yes.

 6           THE COURT:  And did she have her own bed in the house?

 7           THE WITNESS:  She had a bed, yeah, in my sister's

 8  room.

 9           THE COURT:  Was that while your sister was still

10  living there or after she moved on to college?

11           THE WITNESS:  My younger sister, she's 15, she hasn't

12  moved on to college.

13           THE COURT:  Oh, okay.  I thought when someone left for

14  college there was a bed -- the testimony I heard was there was

15  an extra bed in the house when someone --

16           THE WITNESS:  Uh-huh.

17           THE COURT:  -- went to college, and at that time she

18  got that bed.  Is that your recollection?

19           THE WITNESS:  I don't really have a memory of that

20  specific bed, like when that happened.

21           THE COURT:  Did she ever sleep on the floor, --

22           THE WITNESS:  Sometime --

23           THE COURT:  -- as has been testified to?

24           THE WITNESS:  Yes, sometimes, but we all slept on the

25  floor sometimes.  We'd build forts and sleep in the living

1   room.

2             THE COURT:  Okay.  So hers was more sleeping on the

3   floor for her own enjoyment as opposed to being --

4             THE WITNESS:  Being forced.  Never.

5             THE COURT:  Not having a bed --

6             THE WITNESS:  Exactly.

7             THE COURT:  -- to sleep in?  All right.

8   BY MR. NOLAN:

9   Q   Did you -- did you get a driver's license at some point

10  growing up?

11  A   Yes.

12  Q   Did Jane Doe ever have a driver's license?

13  A   She had no way of getting a driver's license.

14  Q   I can't hear a word you're saying.

15  A   No.

16  Q   She did not have a driver's license?

17  A   No.

18  Q   So that's a difference, then.  So it wasn't the only

19  difference.

20  A   Okay.  I said with -- in regards to the citizenship, with

21  her driver's license, that's something else I don't understand

22  how she would get a driver's license.  So I feel like it falls

23  under the realm of the difference that I stated earlier.

24  Q   Did your parents ever buy you a car?

25  A   I have a car, yes.

1  Q    Did your parents buy you that car?

2  A    Yes.

3  Q    Okay.  Did your --

4  A    We're still paying it off.

5  Q    Did your parents ever buy Jane Doe a car?

6  A    No.  She didn't have a license.

7           THE COURT:  Your sarcasm isn't appreciated.

8           THE WITNESS:  I'm so sorry.  I'm --

9           THE COURT:  I think you understand the point he's

10  making.

11          THE WITNESS:  Yes.  I understand.  I understand.  I'm

12  sorry.

13          THE COURT:  He's making a point, differences in

14  treatment.  Did you have affection for Jane Doe?

15          THE WITNESS:  Yes.  When they came to me --

16          THE COURT:  Did you love Jane Doe?

17          THE WITNESS:  Yes.  When they came to me and told me

18  she was missing, I cried.

19          THE COURT:  Okay.

20          THE WITNESS:  And I told them that I would help them

21  find her.  I never wanted anything bad to ever happen to her.

22  Like I said, she was part of the family.

23          THE COURT:  Okay.  And so what he's asking, the line

24  of questions he's asking --

25          THE WITNESS:  Yes.

 1              THE COURT:  -- is, was she treated differently than

 2   other people in the house?  For whatever reason you're saying,

 3   --

 4              THE WITNESS:  Yes.

 5              THE COURT:  -- was she treated differently than other

 6   children in the house?  That's his questions.

 7              THE WITNESS:  Okay.

 8              THE COURT:  We will get through this so much better if

 9   you will listen to his question --

10              THE WITNESS:  Yes.  I'm sorry.

11              THE COURT:  -- and not be sarcastic --

12              THE WITNESS:  Yes.  I'm sorry.

13              THE COURT:  -- and answer the question.

14              THE WITNESS:  I'm sorry.  I apologize.

15              THE COURT:  Please continue.

16              MR. NOLAN:  Actually, at this time, Your Honor, we

17   have no further questions for this witness.

18              THE COURT:  All right.  Are there any other questions

19   for this witness?

20              MS. PERLSTEIN:  Brief follow-up.

21              THE COURT:  All right.

22                          REDIRECT EXAMINATION

23   BY MS. PERLSTEIN:

24   Q   The scars that the Government is talking about on her arms,

25   would you identify those as -- did you recognize those as

 1  scars?

 2  A    She had, yes, some marks on her arms.  So do my brothers.

 3  Q    Did she --

 4  A    From -- oh, sorry.

 5  Q    That's okay.  Did she participate in activities, certain

 6  activities that could leave marks on her?

 7  A    Yes.

 8  Q    What were they?

 9  A    She climbed trees.  She, I mean, would go outside, like we

10  all liked played outside.  (inaudible) fell.  I mean, we were

11  --

12  Q    What is Parkour?

13  A    Parkour --

14        MR. NOLAN:  Objection, Your Honor.  The witness

15  already said she doesn't know how they got on there.  I think

16  we've covered this.  For the sake of time, --

17        THE COURT:  No, I think I wouldn't let her --

18        MR. NOLAN:  Okay.

19        THE COURT:  -- answer that question.  She answered

20  your question.  So this is different.   You can answer.

21  BY MS. PERLSTEIN:

22  Q    What is Parkour?

23  A    Parkour is -- it's my understanding when people go and like

24  jump and do things off of like walls, buildings, ledges.  Just

25  like -- yeah, just kind of like jumping and moving around a

1  lot.

2  Q   Was that something she was interested in?

3  A   To my knowledge, yes.  When my -- my brother had also had

4  interest in it, and I think that there were a few times where

5  they would both, you know, partake in like Parkour activities.

6  My oldest brother was involved in that.

7  Q   Did you ever see your parents hit Jane Doe with an electric

8  cord?

9  A   No.

10 Q   Were any of you ever hit with an electric cord?

11 A   No.

12 Q   Were you ever sat on to have a punishment carried out?

13 A   No.

14 Q   Did you ever see your parents sit on Jane Doe to have a

15 punishment carried out?

16 A   No.  I don't remember that ever happening.

17 Q   You talked about having her sleep on the couch or fall

18 asleep on the couch because she liked to watch TV.

19 A   She watched a lot of TV.

20 Q   Was that an activity that you all participated in together?

21 A   Yes.  We watched a lot of shows together.  Like the best

22 memory I have is *Dancing with the Stars*, like we would watch it

23 every time it aired as a family around the TV.

24 Q   And in a lot of instances, would you eat dinner and watch

25 TV?

1    A    Yes.

2    Q    Would she watch with you and eat --

3    A    Yes.

4    Q    -- dinner?

5    A    Yes.

6    Q    Did she participate in meals with you?

7    A    Yes.

8    Q    The Government is asking she's not like the rest of your

9    siblings, and she's not your sibling, correct?

10   A    Correct.

11   Q    But was she treated like part of the family?

12   A    Absolutely.

13   Q    His Honor asked you if you had affection for Jane Doe.  And

14   did you have affection for Jane Doe?

15   A    Yes.

16   Q    In fact, and we're not going to call your younger sister,

17   but your younger sister was the person who Jane Doe told she

18   was leaving, correct?

19   A    Correct.  And my (inaudible), yes.

20   Q    She was there that day?

21   A    Yes, to the best of my knowledge, she was there.

22   Q    And when Jane Doe told her she was leaving, she cried?

23   A    Yes.  To my knowledge.

24   Q    And to the best of your knowledge, and you were there for

25   this conversation, your younger sister said, to not betray Jane

1  Doe, she didn't call and tell your parents, correct?

2  A   For that -- that specifically, I don't know.  But I do know

3  like in regards to her leaving, I have spoken with my younger

4  sister about it, and she left while she was in the house and

5  she cried.

6  Q   So this escape that we're talking about, she went to your

7  younger sister and said, I'm leaving?

8  A   Yes.  Yes.  That's how I understand it, yes.

9  Q   And then she walked out of the house?

10  A   Yes.

11  Q   To be fair, your feeling and your emotion at this point is

12  anger?

13  A   Yes.

14  Q   And why is that?

15  A   I just don't understand why she would do this to us.

16       THE COURT:  I can't understand that.  You're going to

17  --

18       THE WITNESS:  I'm sorry.

19       THE COURT:  Take your time.  Calm down and --

20       THE WITNESS:  I just don't understand why she would do

21  this to us.

22       MS. PERLSTEIN:  Pass the witness.

23       THE COURT:  Okay.  Thank you.  You may step down.

24       THE WITNESS:  Thank you.

25     (The witness steps down.)

```
 1              THE COURT:  You may call your next witness.

 2              MR. PALMER:  Your Honor, we will call Cindy Fentriss.

 3              THE COURT:  Ma'am, if you would please come forward.

 4              MR. PALMER:  This will be our last witness, Your

 5    Honor.

 6              THE COURT:  Okay.  Ma'am, if you would come right up

 7    here, please.  I'm going to ask you to raise your right hand

 8    and be sworn by my clerk.

 9         (The witness is sworn.)

10              THE COURT:  Thank you.  If you would, come have a

11    seat.  Just speak into the microphone.  And when you state your

12    name, if you would spell it for the record.

13              THE WITNESS:  Okay.  I'm Cindy Fentriss, and my last

14    name is F-E-N-T-R-I-S-S.

15              THE COURT:  Thank you.

16            CINDY FENTRISS, DEFENDANTS' WITNESS, SWORN

17                      DIRECT EXAMINATION

18    BY MR. PALMER:

19    Q   Ms. Fentriss, can you please tell the judge how close you

20    lived to the Toures?

21    A   Yes.  So, I live around the block.  Down the street.  So,

22    --

23    Q   And you have how many children?

24    A   Six.

25    Q   Okay.  And would you -- are you currently in possession of
```

1    the youngest daughter?

2    A    Yes.

3    Q    Their youngest daughter?

4    A    Yes.  Yes.  Rima.

5    Q    How many children do you have in your home today?

6    A    Two.  Of my own.

7    Q    All right.  Two of your own and one --

8    A    And one of the Toures.

9    Q    Okay.

10   A    Yes.

11   Q    And you were -- you were asked by the family to step in and

12   take over --

13   A    Yes.

14   Q    -- on Wednesday?

15   A    On Wednesday.

16   Q    And you did it without hesitation?

17   A    Absolutely.

18   Q    All right.

19          MR. PALMER:  Can we get -- yeah.  I need to approach on

20   that same issue.

21          THE COURT:  You may.

22      (Pause.)

23          THE COURT:  Do you understand the instruction?

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you.  I appreciate it.

1  BY MR. PALMER:

2  Q   I have a feeling you probably picked up on it, but I just

3  want to make sure.

4  A   I know.  It's hard to --

5  Q   All right.  You are here today -- we met yesterday,

6  correct?

7  A   Uh-huh.

8  Q   You have to say yes.

9  A   Yes.

10 Q   All right.  And you are here as sort of a representative of

11 this community --

12 A   Yes.

13 Q   -- in Southlake?  So why don't you tell the judge, as

14 succinctly as you can, what it is that you have -- your

15 knowledge of these folks and why you are here to vouch for them

16 --

17 A   Uh-huh.

18 Q   -- and their ties to the community, as far as you know it?

19 And just go back to the beginning.

20 A   Well, I've known the Toure family since our two youngest

21 daughters were probably four and five.  They were in preschool

22 together.  And so they just developed a friendship and were

23 just, you know, friends.  And I think we had Rima as a

24 sleepover.  Her first sleepover was at our house.  So obviously

25 what comes with that naturally is a friendship with the mom.

1   So she's just one of my dearest friends, and I -- I don't know.

2   We live life together with our children and going to sports

3   and, you know, just in and out, neighbors and parents of our

4   kids.  So, --

5   Q   Well, there are times when you can have children's -- your

6   children's friends, you don't necessarily like the parents, --

7   A   Right.

8   Q   -- much less socializing.

9   A   Yeah.  But that's --

10  Q   Not the case here?

11  A   That's not the case.

12  Q   All right.  You're -- you became like best friends with

13  these people?

14  A   Yeah.  Well, I mean, I would do anything for their family.

15  Q   Okay.

16  A   And I know she would do the same.  You know, I've called on

17  her when I have a need to -- somebody to run to the house

18  because the brownies were left on and I was at a sporting

19  event, you know.  So she was my call.

20  Q   Dependable?  Denise Cros-Toure is dependable?

21  A   Yes.

22  Q   Do you trust her --

23  A   Yes.

24  Q   -- with your own children?

25  A   Yes.

1  Q   Do you know her to be this -- this woman who beats people

2  with an --

3  A   No.

4  Q   -- electrical cord?

5  A   No.

6  Q   All right.  Does that sound out of character?

7  A   Yes.

8  Q   Do you -- you trust her with your own children and you

9  trust her with your home?

10  A   Yes.

11  Q   Has she been in your home?

12  A   Yes.

13  Q   You shared with me, and I'm -- I've tried to recreate it

14  for the judge, but a video from December 31st of 2009?

15  A   Uh-huh.

16  Q   All right.  Because we don't have it and we're trying to

17  get things moving along, describe to the Court who was there

18  that night from the Toure family.

19  A   Yeah.  We just had a New Year's party, and so Denise came

20  with Sarah and Timou and Rima and (inaudible).  Or, and Jane

21  Doe.

22  Q   Jane Doe.  Jane Doe, was she dressed up in a --

23  A   Yeah.  It was a festive, you know, occasion.  And we had

24  some neighbors.  And it was kind of random friends and just

25  fun, and of course we had them join, and Rima and, you know,

 1  Emily played.  It was just a natural --

 2  Q    The segment of video you showed me, was it after midnight

 3  and everyone's popping these --

 4  A    Uh-huh.

 5  Q    -- noisemakers and Jane Doe was fully participating and

 6  having a good time, --

 7  A    Uh-huh.

 8  Q    -- right?  What did you see her as -- what did you identify

 9  her being in -- as part of the Toure family?

10  A    Um, --

11  Q    How would you articulate that for the judge?

12  A    Well, I think it was just that, a part of -- a part of her

13  family.  I mean, she was just in and out with Denise in my

14  house.  I mean, I had one-on-one conversations with her.  I

15  don't know.  She would support -- you know, I remember one time

16  when Emily ran track with Rima and it was like Jane Doe became

17  coach, you know, encouraging the girls.  And I don't know, it's

18  just life, in and out, when your families are all together at

19  events.

20  Q    Did she ever take you aside or whisper to you that I'm

21  being held captive --

22  A    Never.

23  Q    -- and they're beating me?

24  A    Never.

25  Q    They've making me do all this work and they're not paying

1   me?

2   A    Huh-uh.

3   Q    No?

4   A    Never.

5   Q    Did you ever know her to be doing work for no pay inside

6   the home?

7   A    No.

8   Q    Separate and apart from --

9   A    It didn't --

10  Q    -- normal daily living?

11  A    It wasn't -- there wasn't anything like that.  I mean, it

12  was just natural.  I don't know how to put it in words.  Just

13  natural living with family and a sibling or -- I knew her as a

14  cousin.

15  Q    Okay.  You also knew that -- well, can you give us the year

16  that you met the Toures?  Because Emily is your youngest,

17  correct?

18  A    Yes.

19  Q    Give us the year when she was four or five.

20  A    That would have been two thousand -- she was six.  2006.

21  Q    2006?

22  A    Would be five.

23  Q    Okay.  So you've known Jane Doe for now 12 years?  Well, --

24  A    Eleven, maybe.

25  Q    About ten years until she left, about?  2006 to --

1  A    Uh-huh.

2  Q    -- 2016.  Right?

3  A    Right.

4  Q    You knew -- did you understand -- what did you think her

5  age was?

6  A    Well, by the time I probably got, you know, familiar, more

7  familiar with the family and got to know her, because I think I

8  asked, you know, you know, who she was or how she came, and in

9  my mind she was at that time about the same age as my oldest,

10 so I just kind of locked that in.  I just sort of had that

11 locked in.

12 Q    Which is what age?

13 A    He's 30 now.

14 Q    Okay.  Does she appear -- you've seen pictures -- well, we

15 went over it yesterday, and some of the pictures that you

16 provided me.

17 A    Yes.

18 Q    Do you think she's around that age?

19 A    Yes.

20 Q    Okay.  And again, all the things that have been portrayed

21 in the complaint and the testimony from the agent, did you see

22 any of that in your observations of this family --

23 A    No.

24 Q    -- and Jane Doe specifically?

25 A    No.

1  Q   All right.  Did you know her to travel with this family?

2  A   No.

3  Q   Did you --

4  A   Oh, travel?  Well, like in cars together?

5  Q   Well, cars or --

6  A   Yes.

7  Q   -- vacations with them in continental --

8  A   No vacation, but just in cars, in and out, you know.  Town

9  Square.  Picking up, dropping off.

10 Q   Okay.  All right.  Did you ever notice scars fresh on her

11 arms from healing, or elsewhere?

12 A   No.

13 Q   Did she ever tell you that she had been beaten by Denise

14 Cros-Toure?

15 A   Never.

16 Q   Ever give you any inkling that --

17 A   Never.  Nothing.

18 Q   Hold on.  Hold on.  Let me finish.

19 A   Oh, sorry.

20 Q   Any inkling that something was amiss at this house that you

21 felt in your motherly instinct that --

22 A   No.

23 Q   -- there's something not right here?

24 A   Huh-huh.

25 Q   No?

 1  A    Nothing.

 2  Q    All right.  You know she didn't go to school.  By the time,

 3  well, by the time you met her, she would have been closer to

 4  17, 18?

 5  A    She would have been out of school.  So, that just never was

 6  anything that was asked or talked about.  I knew she was from

 7  Africa and --

 8  Q    Did you see -- did you ever see Denise Cros-Toure or Mr.

 9  Toure treat her differently than any of the other kids when you

10  were around them, the entire family?

11  A    No.

12  Q    All right.  Did you invite her to your daughter -- or, did

13  your daughter invite her to her wedding?

14  A    Yes.

15  Q    All right.  Tell the judge briefly about that.  And there's

16  some pictures, and maybe --

17          MR. PALMER:  Your Honor?

18          THE WITNESS:  Yes.

19  BY MR. PALMER:

20  Q    Is that your daughter and is that -- in the Picture Number

21  --

22  A    Yes.

23  Q    All right.  And there's also another picture --

24          THE COURT:  That was #1, and then there's one of a

25  bouquet being thrown.  Would that have been the same event?

1              THE WITNESS:  Yeah.  So, my daughter was married.

2    They got married in Burleson.  And so Denise couldn't come, so

3    she drove Jane Doe and Rima down, which is 45 minutes, at

4    least, yeah, to the wedding, for them to attend.  So, yeah.

5    BY MR. PALMER:

6    Q    Who's the young man hugging her?

7    A    And that is my brother -- or, son-in-law.

8    Q    He was close enough to her --

9    A    Yeah.

10   Q    -- to give her a hug and --

11   A    Uh-huh.  Absolutely.

12   Q    And you provided those to the Defense counsel this weekend?

13   A    I'm sorry?

14   Q    You provided those pictures --

15   A    Yes.

16   Q    -- as well as many others --

17   A    Yes.  Yes.

18   Q    -- to sort of give a snapshot to us and to the Court as to

19   the life that you knew?

20   A    Yes.

21   Q    All right.  Do you believe that if the judge saw fit to

22   release both Denise and Mohamed Toure, that they will attend

23   everything that they're required to attend, every court date

24   setting?

25   A    I believe with all my heart that they would.

1   Q    Are these the type of people to get out and abandon five

2   children, --

3   A    No.

4   Q    -- one still in school?  Okay.  They have a home in

5   Southlake, correct?

6   A    Yeah.

7   Q    Ties --

8   A    Yes.

9   Q    -- to the community?

10  A    Pardon me?

11  Q    Ties to the community?

12  A    Yes.

13  Q    They've been --

14  A    Their daughter here.

15  Q    They've been here a long time?

16  A    Yes.

17  Q    All right.  The outpouring of support is impressive to you,

18  --

19  A    Uh-huh.

20  Q    -- yes?

21  A    Yes.

22  Q    All right.  And are you going to do whatever you can do as

23  a neighbor and friend to support them throughout this time?

24  A    Yes.

25  Q    All right.  Do you believe that the judge should have any

1   reluctance whatsoever in making the decision to release these

2   two folks pending the trial in this case?

3   A   Can you ask me that again?

4   Q   I sure can.

5   A   I don't know if it was just a yes or no --

6   Q   Should this Court, --

7   A   Yes.

8   Q   -- this judge, have any reluctance whatsoever --

9   A   No.  No.  I have no reason to believe anything otherwise.

10  None.

11  Q   In fact, do you have reason to believe that they will do

12  everything --

13  A   Yes.

14  Q   -- and stay and fight these charges?

15          MR. PALMER:  Pass the witness.

16          THE COURT:  Cross-examination?

17          MR. NOLAN:  Just very briefly, Your Honor.

18                          CROSS-EXAMINATION

19  BY MR. NOLAN:

20  Q   Prior to the recent arrests last week, the Toures were

21  traveling, isn't that correct?  You were aware of --

22  A   I'm so sorry.  I couldn't hear --

23  Q   You were aware of a recent trip that the Toures had taken?

24  They were out of the country --

25  A   Yes.

Fentriss - Cross                    158

1   Q    -- pretty recently and they had just gotten back.   Is that

2   correct?

3   A    Yes.

4   Q    Yeah.   How long were they out of the country during that

5   past trip?

6   A    I think they left at Christmas and then she was back maybe

7   at the end of March maybe.   Possibly.   That sound right?   I'm

8   not sure exactly.

9   Q    Is it normal for the Toures to do a good deal of travel?

10  A    I am so sorry.   I couldn't hear you.

11  Q    Is it normal for the Toures to do a good deal of travel?

12  A    Mohamed a little more, but not Denise.

13  Q    Okay.   International travel for Mohamed?

14  A    I mean, well, back to Guinea.

15  Q    Okay.   Would --

16  A    Or that I know.

17  Q    Would it be normal that he would travel there multiple

18  times during the year?

19  A    Mohamed?

20  Q    Yeah.

21  A    Yes.

22  Q    Large stretches of time?

23  A    Yes.

24  Q    And actually, Denise travels quite a bit internationally as

25  well, right?

1   A    This past year, yes.

2   Q    Okay.  And in fact, during their most recent trip, were you

3   responsible for looking out for their youngest child?

4   A    No.

5   Q    You weren't?

6   A    No.

7   Q    But you were the person that was contacted by a truancy

8   officer when it found out that that child wasn't going to

9   school; isn't that correct?

10  A    Yes.

11  Q    Okay.  And what --

12  A    Wait, that she wasn't going to school?  Is that -- was that

13  the question?

14  Q    Can you tell me any other reason why a truancy officer

15  would contact you?

16  A    Yeah.  He didn't -- that's not how I received the call.  I

17  received it that they were just -- she had not called in and

18  she hadn't come to her second block and so they were just -- I

19  was just getting a call to see if I knew anything, because I'm

20  on the list.

21          THE COURT:  So you're on the call list --

22          THE WITNESS:  I'm on the call --

23          THE COURT:  -- for the school if there's an issue?

24          THE WITNESS:  Yes.

25          THE COURT:  All right.

1  BY MR. NOLAN:

2  Q    All right.  And you said you've known the Toures for about

3  ten years; --

4  A    Uh-huh.

5  Q    -- is that correct?

6  A    Yeah.

7  Q    Okay.

8  A    Eleven.

9  Q    And what did Denise Toure tell you in terms of Jane Doe's

10 situation?  How did she describe her relationship to the

11 family?

12 Q    And I was thinking about this.  I don't know if we had like

13 a direct conversation.  I think that maybe I've gotten

14 information from her and Jane Doe, but I know that what I know

15 is or I understand is she's a cousin and they're helping her or

16 they were taking care of her or I didn't even know if she had

17 parents.  I didn't even know about parents.  You know, so I

18 just got the feeling it was a need that was being fulfilled.

19 Q    Okay.  And so some of what you're learning about her

20 situation, you actually have been learning over the last

21 several days.  Is that fair to say?

22 A    Say that one more time?

23 Q    So, what you've been learning about her situation, is it

24 fair to say that a lot of it you've been learning over the last

25 several days?

 1  A    So, the things that she's saying that has --

 2  Q    Things about conditions in the home, things about her

 3  father, how she got here, her --

 4  A    Yeah.  No, this --

 5  Q    -- immigration status, all of that?  You've been --

 6  A    Yeah, I've not heard -- that's not information that I've

 7  heard before.

 8  Q    Okay.  So you had no idea that any of that was happening in

 9  the ten years that you knew her?

10  A    Well, I mean, no.  There was no --

11  Q    Okay.  Okay.

12         MR. NOLAN:  I don't have any further questions, Your

13  Honor.

14         THE COURT:  All right.  Anything further?

15         MR. PALMER:  Nothing, Your Honor.

16         THE COURT:  Thank you.  You may step down.

17         THE WITNESS:  Am I done?

18     (The witness steps down.)

19         THE COURT:  So the Defense rests?

20         MR. WYATT:  Yes.  We would rest, Your Honor.

21         MR. PALMER:  Rest, Your Honor.

22         THE COURT:  All right.  Does the Government wish to

23  offer any evidence in rebuttal at this time?

24         MS. BAILEY:  No, Your Honor.

25         THE COURT:  Okay.  Then I'll consider the evidence

1   closed.

2       Does either side wish to be heard in summation?  Does the

3   Government wish to be heard?

4           MS. BAILEY:  Yes, Your Honor.

5           THE COURT:  Okay.  You may.

6           MS. BAILEY:  All right.  Your Honor, thinking of the

7   detention hearing and going through the elements as laid out in

8   3142, this is a forced labor case which falls under Chapter 77.

9   Therefore, we have a rebuttable presumption that detention is

10  appropriate.

11      There is significant evidence against the Defendants in

12  this case to support the charges as been presented to you today

13  as was presented to you in the complaint.

14      Looking, then, to the (g)(3)(A) factors and thinking about

15  the character of the Defendants, they harbored -- at least

16  harbored an illegal alien for 16 years here in the United

17  States.  At most, which we believe the evidence shows, there

18  was also -- the purpose of that harboring was for forced labor.

19  You've heard testimony about the fact that Jane Doe herself

20  considered herself to be a family member, albeit not treated

21  like the rest of the family, and you've heard testimony that

22  the family itself felt that she was that way.

23      However, the Toure's daughter can't even tell you the name

24  of (inaudible)'s sister in Guinea, nor what village she was

25  born in.  This idea that she was family was part of a coercive

1   scheme to keep her in the house from the time that she was a

2   minor child and she served to provide all of this labor for the

3   family.

4        As far as the length of residence and community ties here

5   in the United States, there's no employment record for Mr.

6   Toure here in Texas.  He travels frequently to Guinea, as you

7   see in Exhibit 4.  His job is in Guinea, for all intents and

8   purposes, to work in a political party there.  He possesses

9   three travel documents.  When he came back this month, he had

10  not been back in the United States for a year and a half.

11       Thinking of Ms. Cros-Toure, she was gone a large portion of

12  2017, and she left her children here for five months starting

13  in December of 2017 until she came back on April 8th.

14       They do have five children in the United States, but all

15  but one of them is grown.  Three of them don't even live in the

16  DFW area.

17       While we don't know of any criminal history for the

18  Defendants, the charges in this case go back 16 years, and the

19  Government would proffer that there are allegations before the

20  Court that this was -- Ms. Doe was actually the third person

21  that these Defendants brought into their home for forced labor.

22       The Government has significant concerns that the Defendant

23  will contact the victim and her family in Guinea.  In Mr.

24  Toure's own statement that he provided, he mentions talking to

25  that family.  They -- the Defendants have extensive resources

1    in Guinea, and there are witnesses that we have spoken to and

2    witnesses who we plan to call and bring before the Court for a

3    trial.

4        The Defense has already shown us in their press conference

5    and in their posts to newspapers that their strategy will be to

6    attack the victim's credibility.  In the *Washington Post,* Mr.

7    Palmer said, quote, but revealing the motivation of this woman,

8    meaning Jane Doe, to lie, betray, and attempt to destroy the

9    family that took her in at the request of her father will be

10   their strategy.  We are concerned that, based on that strategy,

11   they're going to put pressure on also the witnesses here in the

12   United States.

13       Therefore, we believe that the presumption holds and that

14   these two Defendants should be detained.

15           THE COURT:  All right.  Does the Defense -- do you

16   wish to both be heard or --

17           MR. PALMER:  Yes.

18           MR. WYATT:  Yes, Your Honor.

19           MR. PALMER:  Yes.  Yes, your honor.  We wish to both

20   be heard.

21           THE COURT:  All right.  So who goes first and who

22   doesn't get to repeat?

23           MR. WYATT:  I'll go first, Your Honor.  Mr. Wyatt for

24   Mr. Mohamed Toure.

25           THE COURT:  All right.

1          MR. WYATT:  He's lived in this country for 25 years.

2    Sought asylum in this country.  The reason he wanted to come to

3    this country.  He doesn't want to voluntarily go back to

4    Guinea, even though he does have significant ties to Guinea.

5    His dad was the president of Guinea at one point in time.  He

6    is leading an opposition party to try to right wrongs that are

7    in Guinea right now.  But he wants to live in the United

8    States.  He has property here that he's purchased.  He sought

9    asylum in this great nation, Your Honor.  He has five kids that

10   are all citizens.  You heard direct evidence from the stand

11   today from his oldest daughter that they would never leave.

12   You've heard the factors that were listed here, the nature and

13   circumstances of the offense, Your Honor, that there are both

14   sides to this story, Your Honor, that the weight of the

15   Government's proof in this case is rebutted today.

16       We do have the rebuttable presumption, Your Honor.  We have

17   rebutted that, that they are not a flight risk, that they are

18   of good character, that they have ties to the community.  And

19   when you look at the nature and circumstances of the offense,

20   based on what was testified to by the Government's agent and

21   the lack of work that they have put in in this case and the

22   other things that they should have done that they haven't done

23   in this case, Your Honor, but also from the family and friends

24   of the Toures and all the people that are here today, Your

25   Honor, shows that they are not a flight risk.

1    And I -- I'm not sure what Ms. Bailey was saying when she

2    was saying -- when she was saying counsel is going to put

3    pressure on witnesses.  That's the way I just took that, and

4    I'm -- personally, I'm offended by that, that I would put any

5    kind of pressure about anything.  If I want to go talk to a

6    witness, I'm going to go talk to a witness.  I mean, there's

7    nobody says I can't talk to a witness, unless the Court orders

8    me not to talk to a witness.  So if I've got to do that, I will

9    go talk to a witness.  We're not going to put pressure on any

10   witness.  We're not going to try to intimidate any witness.

11   We're going to try to win our case and hold the Government to

12   its proof beyond a reasonable doubt, Your Honor.  We do not

13   believe that they have shown the -- the nature and

14   circumstances of this offense, that we have rebutted this

15   presumption in this case, Your Honor, and they should be let

16   out pending trial, Your Honor.

17       And there are multiple ways. And that's why I asked that

18   question of the agent.  Can you put them on a no-fly list?  Do

19   you have that power?  Do you have the power -- I mean, we

20   obviously know you can put them on electronic monitoring, Your

21   Honor.  We can have them check in weekly, biweekly.  We can

22   have people go by their house.  They can be on house arrest.

23   There are a myriad of different ways that the Court can control

24   the movements of the Toures while they are waiting to fight

25   these charges, Your Honor.

1          Thank you.

2                  THE COURT:  Thank you.  Mr. Palmer?

3                  MR. PALMER:  May it please the Court, counsel.

4          Number one, Your Honor, these presumptions that are in the

5     law, they presume the worst.  They presume certain things that

6     are in the future that are not going to happen.  We have

7     rebutted those presumptions.  Presumptions are dangerous but

8     they're in the law for reason, but we have told the Court

9     through testimony and through this show of force that -- of the

10    community ties that these are good people that we do intend to

11    -- what other strategy would there be but to attack the

12    credibility of a person who is lying?  That's what we have been

13    saying, and I'm proud to say it in front of you, Your Honor.

14         These folks brought this child in -- well, she was a

15    teenager at the time.  We -- I think we've ferreted that out

16    significantly here.  And it was under an arrangement to help

17    her.

18         And I will tell you that her father called me yesterday and

19    I -- I got a call from this crazy number on my phone.  I don't

20    know who these people are.  But there's a man who identifies a

21    man who's sitting in a chair, says he wants to talk to me.  He

22    wanted to talk to Mr. Nolan.  He demanded that I give him his

23    phone number.  And I said, I'm not doing that.  Not at this

24    time.  And that this -- he wants to talk to his daughter now.

25    I said, I cannot do that at the moment.

1    So the shoe is on the other foot at the moment, and I am

2    telling you that we are not putting pressure on anybody.   In

3    fact, they're putting pressure on me to get to their own

4    daughter for whatever reason, but they do not believe that

5    these allegations are true.

6    Number two, Your Honor, this family is tight.   They have

7    raised -- if I can have the children stand up so you know

8    exactly who we are talking about.   This tight family has been

9    on the phone with me and counsel, my team, since Wednesday.

10   They have sweat blood and cried because they love their

11   parents.   Their parents would never, ever pick up and leave.

12   The fact that they traveled in the past frequently, that's

13   over.   There's no way you're going to allow them to travel, and

14   they're not going anywhere because we need them right here to

15   stand and fight.   That's what we're going to do.   We're

16   standing.   We are fighters, and that's what we're going to do,

17   fight until this case is resolved.

18   The weight of the evidence, frankly, Your Honor, on a

19   federal case like this, I would have expected a lot more, a lot

20   different, but this is -- and I'm really questioning, what took

21   so long?   Eighteen months.   They didn't describe nor did the

22   agent even attempt to show you what was going on in the past

23   year.   How long did it take to talk to six people?   Pull a

24   couple medical records?   I don't know, but they clearly had no

25   idea this was going on, and they traveled back to the United

1    States.   And there they are, and they were sitting ducks in

2    their home on Wednesday when 15 federal agents came, armed.

3        Additionally, your Pretrial team, who knows their job and

4    knows how to interview and knows the factors that you're

5    looking for, recommends both Mr. Toure and Ms. Cros-Toure to be

6    released.   That is huge.   And we ask that you adopt their

7    recommendation, allow these two nice folks with no criminal

8    history, significant ties to this community, and every -- five

9    reasons to stay and fight.

10       I will tell you that, whatever the allegations, we intend

11   to refute them, as stated by counsel.   They can quote me from

12   the *Washington Post* to the moon, because that's what we're

13   going to do, Judge.   We've spent all weekend on this.   I'm glad

14   they asked for a continuance.   They gave us the time to sort of

15   recollect and fashion these pictures that show a whole

16   different life than they're trying to allege.

17       It's clearly the motivation of this Jane Doe to stay in

18   this country and get that visa, that precious visa, but at the

19   cost of this family that raised her, gave her food, clothing,

20   shelter, running shoes, tablets, allowed her to work outside

21   the home.   Who does that if you're enslaving somebody, Your

22   Honor?

23       For all the reasons and all the factors that are listed in

24   the law, we ask that you do not detain these folks and allow

25   them -- if you have to fashion conditions accordingly, they'll

1    obviously abide by it.  They're already tendered their

2    passport, their Guinea passports.  We will tender their French

3    passports.  And if you require the -- further, I have it in my

4    office, the -- we both have our respective client's green card

5    and we will certainly tender that immediately.

6        But we believe that there are a sufficient combination of

7    conditions that you can fashion and you should do so and you

8    will not have any regret whatsoever.  They will be here.  They

9    will do everything you ask them to do.  Thank you.

10            THE COURT:  All right.  Final word from the

11   Government?

12            MS. BAILEY:  Yes, please.  Your Honor, the Government

13   has never used the word slavery or slave.  This case is about

14   forced labor.  It is the Defense that has repeatedly brought

15   that term to bear, and it is quoted in the complaint because

16   Ms. Cros-Toure said it to Jane Doe.  It is not what the

17   Government has said.

18       It is not up to you to make this decision based on what

19   Probation recommends.  It is the rebuttable presumption that is

20   in the Code.

21       Given the possibility of the lengthy incarceration and the

22   travel history that these two Defendants present, it frankly

23   would be a legitimate and reasonable choice for them to leave.

24   They have multiple passports.  Their travel history for the

25   past 18 years has showed repeated travel to numerous countries.

1  They could very well get on a private plane, and the Government

2  doesn't want to see their electric monitoring bracelets leaving

3  on a private plane.  There's no MLAT treaty for extradition

4  with Guinea, so if they leave, that's it.  Flying to Africa or

5  Europe is a commonplace event for these Defendants.  It's not

6  exceptional at all.  A high bail or frequent check-ins also is

7  not going to do the trick.

8     Your Honor, the Government has put forth multiple reasons

9  for detention in this case and the Defendants have not provided

10 enough evidence to rebut the presumption.

11       THE COURT:  All right.  Thank you.  I thank both sides

12 for their presentations.

13    Well, probable cause is a low threshold and I find the

14 Government has presented sufficient evidence to meet that

15 threshold, but I do find the Defense has rebutted the

16 presumption and shown that they're not a risk of flight or a

17 danger to this community and I can set conditions that will

18 reasonably assure the Court of just that.  I'm accepting and

19 adopting and the recommendation from Pretrial Services in this

20 case.

21    (Applause.)

22       THE COURT:  Stop.  Stop.  Stop.  Stop.  We are going

23 to take a brief recess to allow me to -- and I think I want to

24 consult with counsel in the back on conditions.  Mr. Toure and

25 Ms. Cros-Toure, if you will remain here, your counsel will go

 1  over the conditions with you, and I will as well, before we

 2  finally adjourn.  All right.  We stand in recess.

 3          THE CLERK:  All rise.

 4      (A recess ensued from 1:53 p.m. until 2:14 p.m.)

 5          THE COURT:  All right.  We are back on the record in

 6  Cause No. 4:18-MJ-268, United States versus Mohamed Toure and

 7  Denise Cros-Toure.  During the brief recess, an order setting

 8  conditions of release has been prepared.  If you could pull the

 9  microphones toward each Defendant, I just have a few questions

10  to go over with each of you.

11      Mr. Toure, have you had sufficient time to review the order

12  setting conditions of release?

13          DEFENDANT TOURE:  Yes, sir.

14          THE COURT:  Do you understand all the conditions that

15  are set forth in the order?

16          DEFENDANT TOURE:  Yes, Your Honor.

17          THE COURT:  Ms. Cros-Toure, have you had sufficient

18  time to review the order?

19          DEFENDANT CROS-TOURE:  (faintly)  Yes, sir.

20          THE COURT:  Okay.  Oh, I'm sorry.  I think I had muted

21  that earlier when you all were speaking.  So let's try again.

22  Have you had sufficient time?

23          DEFENDANT CROS-TOURE:  Yes, sir.

24          THE COURT:  Okay.  And do you understand all of the

25  conditions set forth in the order?

1            DEFENDANT CROS-TOURE:  Yes, sir.

2            THE COURT:  On Page 3 of each of the orders, it

3 appears to be signed by each Defendant under "Acknowledgement

4 of the Defendant."  Is it your signature that appears on the

5 original I have before me?  Mr. Toure?

6            DEFENDANT TOURE:  Yes, sir.

7            THE COURT:  And Ms. Cros-Toure?

8            DEFENDANT CROS-TOURE:  Yes, sir.

9            THE COURT:  Just above your signatures, there's a set

10 of provisions which set forth the possible penalties and

11 sanctions should you fail to comply with the conditions.  Did

12 each of you review those potential penalties and consequences?

13 Mr. Toure?

14            DEFENDANT TOURE:  Yes, sir.

15            THE COURT:  And Ms. Cros-Toure?

16            DEFENDANT CROS-TOURE:  Yes, sir.

17            THE COURT:  Do you understand it can be a separate

18 federal offense for you to fail to comply with these

19 conditions?  Mr. Toure?

20            DEFENDANT TOURE:  Yes, sir.

21            THE COURT:  And Ms. Cros-Toure?

22            DEFENDANT CROS-TOURE:  Yes, sir.

23            THE COURT:  There's an additional consequence I need

24 to make sure you're aware of, and that is your failure to

25 comply with these conditions could adversely affect your

1   present case you have before our Court.  In other words, a

2   district judge could at some point in the future determine that

3   you had failed to accept responsibility for any actions if

4   you're unable to comply with these conditions.  Your counsel

5   can explain to you in more detail if you have further

6   questions, but do each of you understand there is that

7   potential consequence as well?  Mr. Toure?  Do you understand?

8           DEFENDANT CROS-TOURE:  Speak.

9           DEFENDANT TOURE:  Yes, sir.

10          THE COURT:  Okay.

11          DEFENDANT CROS-TOURE:  Yes, sir.

12          THE COURT:  And Ms. Cros-Toure?  All right.

13     Let me ask counsel for the Government:  Are there any other

14   conditions you would ask the Court to impose that are not set

15   forth in the order?

16          MS. BAILEY:  No, Your Honor.

17          THE COURT:  Are there any issues from the Defense as

18   to the conditions as set?  Mr. Wyatt?

19          MR. WYATT:  No, Your Honor.

20          THE COURT:  Mr. Perlstein [sic]?

21          MS. PERLSTEIN:  No, Your Honor.

22          THE COURT:  Okay.  There is travel restrictions.  And

23   I know your attorneys went over that with you.  These

24   conditions will go into effect the moment all those travel

25   documents, the passports for each of you are submitted and

1   turned in.  At that point, the conditions will go into effect.

2   I'm informed that's going to happen fairly quickly.  So my

3   intention is to have you brought back here tomorrow and

4   released from here once those have been secured.

5        Do you have any questions about the conditions?  Mr. Toure?

6              DEFENDANT TOURE:  No, thank you, Your Honor.

7              THE COURT:  Ms. Cros-Toure?

8              DEFENDANT CROS-TOURE:  No, sir.

9              THE COURT:  All right.  Well, that's the order of the

10  Court.  At this time, I remand the Defendants to the custody of

11  the Marshal pending the conditions for the release.  And the

12  attorneys are excused.  Thank you all.

13             MR. WYATT:  Thank you, Your Honor.

14             MS. PERLSTEIN:  Thank you, Your Honor.

15             MR. NOLAN:  Thank you, Your Honor.

16             MR. PALMER:  Thank you, Your Honor.

17             MS. BAILEY:  Thank you, Your Honor.

18        (Proceedings concluded at 2:17 p.m.)

19                     --oOo--

20                    CERTIFICATE

21        I certify that the foregoing is a correct transcript from
    the digital sound recording in the above-entitled matter.

22  **/s/ Kathy Rehling**                              **05/14/2018**

23  _____        _____

24  Kathy Rehling, CETD-444                              Date
    Certified Electronic Court Transcriber

25

1                                 INDEX

2

3       PROCEEDINGS                                              3

        WITNESSES

4

5       Government's Witnesses        Direct   Cross   Redirect   Recross

        Katherine Langston              5     31/75      93

6

7       Defendants' Witnesses        Direct   Cross   Redirect   Recross

        Sarah Toure                    98      117      140
8       Cindy Fentriss                145      157

9       EXHIBITS

10      Government's Exhibits 1 through 12              Received 95

11      Defendants' Exhibits 1 through 40              Received 95

12      RULINGS                                                  171

13      END OF PROCEEDINGS                                       175

14      INDEX                                                    176

15

16

17

18

19

20

21

22

23

24

25